# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 22, 2016                    Decided July 1, 2016

No. 11-1479

UNITED AIRLINES, INC., ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

BP WEST COAST PRODUCTS LLC, ET AL.,
INTERVENORS

———

Consolidated with 12-1069, 12-1070, 12-1073,
12-1086, 15-1101, 15-1105, 15-1107

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Thomas J. Eastment* argued the cause for Shipper
Petitioners. With him on the briefs were *Gregory S. Wagner*,
*Richard E. Powers*, *Jr.*, *Melvin Goldstein*, and *Steven A.*

*Adducci*. *Frederick G. Jauss* and *Marcus W. Sisk Jr.* entered appearances.

*Charles F. Caldwell* argued the cause for Petitioner SFPP L.P. With him on the briefs were *Dean Lefler* and *Daniel W. Sanborn*. *Deborah R. Repman* entered an appearance.

*Ross R. Fulton* and *Lisa B. Luftig*, Attorneys, Federal Energy Regulatory Commission, argued the causes for respondents. On the brief were *William J. Baer*, Assistant Attorney General, U.S. Department of Justice, *James J. Fredricks* and *Robert J. Wiggers*, Attorneys, *Robert H. Solomon*, Solicitor, Federal Energy Regulatory Commission, *Beth G. Pacella*, Deputy Solicitor, and *Elizabeth E. Rylander*, Attorney.

*Steven A. Adducci*, *Thomas J. Eastment*, *Gregory S. Wagner*, *Richard E. Powers Jr.*, and *Melvin Goldstein* were on the brief for Shipper Intervenors in support of Federal Energy Regulatory Commission.

*Charles F. Caldwell*, *Dean H. Lefler*, and *Daniel W. Sanborn* were on the brief for intervenor SFPP, L.P. in support of respondents. *Elizabeth B. Kohlhausen* entered an appearance.

Before: GRIFFITH and KAVANAUGH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Petitioners SFPP, L.P. ("SFPP") and several shippers—"*i.e.*, firms that pay to transport petroleum products over SFPP's pipelines,"

*ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 947 (D.C. Cir. 2007)—challenge aspects of three orders from the Federal Energy Regulatory Commission ("FERC") related to filings by SFPP for cost-of-service tariffs on its pipelines. SFPP disputes FERC's choice of data for calculating SFPP's return on equity and the Commission's decision to grant only a partial indexed rate for the 2009 index year. The shipper-petitioners (the "Shippers") claim that FERC's tax allowance policy for partnership pipelines, such as SFPP, is arbitrary or capricious and results in unjust and unreasonable rates. We grant-in-part and deny-in-part SFPP's petition and grant the Shippers' petition for review.

## I.   BACKGROUND

SFPP is a Delaware limited-partnership, common-carrier oil pipeline. The pipeline transports refined petroleum products from California, Oregon, and Texas to various locations throughout the southwestern and western United States. On June 30, 2008, SFPP filed tariffs to increase rates on its West Line, which transports petroleum products throughout California and Arizona. These new tariffs had an effective date of August 1, 2008. Also on June 30, 2008, SFPP made a separate tariff filing to decrease the rates on its East Line, which runs from West Texas to Arizona. The purported impetus for these filings was increased throughput on SFPP's East Line due to a recently completed expansion, which accordingly decreased throughput on the West Line. Several shippers protested the West Line tariff filing by raising challenges to SFPP's cost of service.

On December 2, 2009, an administrative law judge issued an Initial Decision addressing the shippers' arguments. FERC reviewed the Initial Decision in Opinion 511, 134 FERC ¶ 61,121 (2011), considered a request for rehearing of

that opinion in Opinion 511-A, 137 FERC ¶ 61,220 (2011), and then reviewed a request for rehearing of Opinion 511-A in Opinion 511-B, 150 FERC ¶ 61,096 (2015). Both SFPP and the Shippers[1] petition this Court for review of these three FERC orders.

SFPP makes two arguments in its petition. First, it claims that FERC arbitrarily or capriciously failed to utilize the most recently-available data when assessing its so-called real return on equity. Second, SFPP asserts that FERC erred when it declined to apply the full value of the Commission's published index when setting SFPP's rates for the 2009 index year. We grant SFPP's petition with respect to the first issue but deny the petition with respect to the second.

The Shippers raise a separate challenge to FERC's current policy of granting to partnership pipelines an income tax allowance, which accounts for taxes paid by partner-investors that are attributable to the pipeline entity. Specifically, the Shippers claim that because FERC's ratemaking methodology already ensures a sufficient after-tax rate of return to attract investment capital, and partnership pipelines otherwise do not incur entity-level taxes, FERC's tax allowance policy permits partners in a partnership pipeline to "double recover" their taxes. We agree that FERC has not adequately justified its tax allowance policy for partnership pipelines and grant the Shippers' petition.

---

[1] The Shippers are: United Airlines, Inc.; Delta Air Lines, Inc.; Southwest Airlines Co.; US Airways, Inc.; BP West Coast Products LLC; Chevron Products Co.; ExxonMobil Oil Corporation; Valero Marketing and Supply Company; and Tesoro Refining and Marketing Company LLC.

## II.   ANALYSIS

Under the standard dictated by the Administrative Procedure Act, we will vacate FERC ratemaking decisions that are arbitrary or capricious.  *See* 5 U.S.C. § 706(2)(A).  Conversely, "FERC's decisions will be upheld as long as the Commission has examined the relevant data and articulated a rational connection between the facts found and the choice made."  *ExxonMobil*, 487 F.3d at 951.  "In reviewing FERC's orders, we are 'particularly deferential to the Commission's expertise' with respect to ratemaking issues."  *Id.* (quoting *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1431 (D.C. Cir. 1996)).  While we have not expressly stated whether we review for substantial evidence FERC's factual findings within orders under the Interstate Commerce Act, "in their application to the requirement of factual support the substantial evidence test and the arbitrary or capricious test are one and the same."  *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (citation omitted); *cf. Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1499 n.39 (D.C. Cir. 1984) (noting the uncertainty surrounding whether the substantial evidence standard applies to FERC's ratemaking decisions under the Interstate Commerce Act).

The statutory regime governing FERC's ratemaking for oil pipelines is unique.  In 1906, as an amendment to the Interstate Commerce Act (the "ICA"), Congress delegated regulatory authority over oil pipelines to the Interstate Commerce Commission.  Pub. L. No. 59-337, § 1, 34 Stat. 584, 584.  But in 1977, Congress transferred regulatory authority over oil pipelines to FERC.  Department of Energy Organization Act, Pub. L. No. 95-91, § 402(b), 91 Stat. 565, 584 (1977); *see also* 49 U.S.C. § 60502.  Congress then repealed the ICA in 1978 *except* as related to FERC's regulation of oil pipelines.  Pub. L. No. 95-473, § 4(c), 92

Stat. 1337, 1470.  For such regulation, the ICA continues to apply "as [it] existed on October 1, 1977 . . . ."  *Id.*  The relevant provisions of the ICA were last reprinted in the appendix to title 49 of the 1988 edition of the United States Code, to which we refer as necessary.  *Cf. BP West Coast Prods., LLC v. FERC*, 374 F.3d 1263, 1271 n.1 (D.C. Cir. 2004).

Substantively, the ICA requires that all rates be "just and reasonable."  49 U.S.C. app. § 1(5)(a) (1988).  Just and reasonable rates are "rates yielding sufficient revenue to cover all proper costs, including federal income taxes, plus a specified return on invested capital."  *ExxonMobil*, 487 F.3d at 951 (citation omitted).

## A.  FERC'S CHOICE OF DATA FOR ASSESSING SFPP'S REAL RETURN ON EQUITY WAS ARBITRARY OR CAPRICIOUS

SFPP challenges as arbitrary or capricious FERC's reliance on cost-of-equity data from September 2008 when calculating SFPP's so-called "real" return on equity and the Commission's rejection of more recent data from April 2009.  FERC argues in response that the more recent cost-of-equity data "encompassed the stock market collapse beginning in late 2008," and was therefore anomalous.  FERC's Br. 31-32.  We agree that FERC had substantial evidence to support its determination that the 2009 data did not reflect SFPP's long-term cost of equity.  However, because the Commission provided no reasoned basis to justify its decision to rely on the September 2008 data, we hold that it engaged in arbitrary or capricious decision-making and therefore grant SFPP's petition on this issue.

The Supreme Court stated in *Federal Power Commission v. Hope Natural Gas Co.*, that "the return to the equity owner [of a pipeline] should be commensurate with returns on investments in other enterprises having corresponding risks." 320 U.S. 591, 603 (1944). Further, "[t]hat return . . . should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *Id.* In accordance with these principles, FERC uses a so-called "discounted cash flow" model to determine a pipeline's rate of return on equity. *See Composition of Proxy Groups for Determining Gas and Oil Pipeline Return on Equity*, 123 FERC ¶ 61,048, at 61,271-73 ¶¶ 3-9 (2008) (discussing the mechanics of the discounted cash flow model). "The premise of the [discounted cash flow] model is that the price of a stock is equal to the stream of expected dividends, discounted to their present value." *Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 57 (D.C. Cir. 1999). Under the discounted cash flow model, FERC "examin[es] the percentage returns on equity the market requires for members of a proxy group." Opinion 511, 134 FERC ¶ 61,121, at ¶ 242. "The members of the proxy group must fall with[in] a reasonable range of comparable risks and have publically traded securities." *Id.* Based on the stock prices of securities within the proxy group, FERC "calculates the yield (the percentage return) by dividing the dollar amount of the distribution by the stock price." *Id.* ¶ 243. After applying the distribution over the long-term, FERC "discount[s] back at the first year's percentage yield to obtain the return on equity required to attract capital to the firm." *Id.* The resulting figure is the "nominal" return on equity.

Under its so-called "trended original cost" methodology, FERC splits the nominal return on equity into an inflation component and the so-called "real" return on equity, defined as the difference between the nominal return on equity and

inflation. *See Williams Pipe Line Co.*, 31 FERC ¶ 61,377, at 61,833-34 (1985). While the pipeline can recover its real return on equity in its current annual rates, inflation "is written-off or amortized over the life of the property." *Id.* at 61,834; *see also Ass'n of Oil Pipe Lines*, 83 F.3d at 1429.

When assessing the pipeline's cost structure, FERC "uses a 'test year' methodology to determine a pipeline's annual cost of service." *BP West Coast*, 374 F.3d at 1298. This method starts with a "base period" that "consist[s] of 12 consecutive months of actual experience" with some specified adjustments. 18 C.F.R. § 346.2(a)(1)(i). FERC then defines a "test period" that generally "must consist of a base period adjusted for changes in revenues and costs which are known and are measurable with reasonable accuracy at the time of [rate] filing and which will become effective within nine months after the last month of available actual experience utilized in the filing." *Id.* § 346.2(a)(1)(ii). In this case, FERC used a base period from January 1, 2007, through December 31, 2007, meaning that the "nine-month adjustment period for test period changes [wa]s from January 1, 2008, through September 30, 2008." Opinion 511, 134 FERC ¶ 61,121, at ¶ 8.

However, for the discounted cash flow analysis, "the Commission prefers the most recent financial data in the record," *id.* ¶ 208, "because the market is always changing and later figures more accurately reflect current investor needs," *Trunkline Gas Co.*, 90 FERC ¶ 61,017, at 61,117 (2000). In other words, FERC may use post-test period data for purposes of the discounted cash flow analysis, "recognizing that updates are not permitted once the record has been closed and the hearing has concluded." Opinion 511, 134 FERC ¶ 61,121, at ¶ 208.

SFPP initially submitted return-on-equity data for the six-month period ending with the test period, i.e., through September 2008. *See* Exhibit SFP-1, Prepared Direct Testimony of J. Peter Williamson on Behalf of SFPP, L.P., No. IS08-390-002, at 3-22 (FERC June 2, 2009). However, the pipeline later provided two updates, one for the six-month period ending January 2009, *see* Exhibit SFP-76, No. IS08-390-002, at 1 (FERC June 2, 2009), and one for the six-month period ending April 2009, *see* Exhibit SFP-323, No. IS08-390-002, at 1 (FERC June 2, 2009). From the September 2008 data, the nominal return on equity was 12.63 percent, with 7.69 percent representing the real return on equity and 4.94 percent as inflation.[2] Opinion 511-A, 137 FERC ¶ 61,220, at ¶ 255. From the January 2009 data, the nominal return on equity was 14.33 percent, distributed between 14.30 percent real return on equity and 0.03 percent inflation. Exhibit SFP-76, at 1. The April 2009 data showed a nominal return on equity of 14.09 percent with a 14.83 percent real return on equity and -0.74 percent inflation. Exhibit SFP-323, at 1. FERC also "incorporated into the . . . record" SFPP cost-of-equity data for the six-month periods ending in February 2010 and March 2010. Opinion 511, 134 FERC ¶ 61,121, at ¶ 209 & n.339. The nominal return on equity from the February 2010 data was 11.24 percent, 2.14 percent

---

[2] There is some ambiguity in the record regarding the September 2008 return on equity data. SFPP's initial filings show that the nominal return on equity for this period was 13.01 percent with 5.37 percent inflation and 7.64 percent real return on equity. *See* Exhibit SFP-1, at 21; Exhibit SFP-5, No. IS08-390-002, at 9 (FERC June 2, 2009); Opinion 511-A, 137 FERC ¶ 61,220, at ¶ 252. As the exact numbers do not affect our holding and the parties otherwise agree that 7.69 percent was the real return on equity for the September 2008 period, we refer to that figure. *See* SFPP's Br. 8; FERC's Br. 33-34.

of which was inflation with a 9.09 percent real return on equity. SFPP's Br. App. A. From the March 2010 data, the nominal return on equity was 11.03 percent, inflation was 2.31 percent, and the real return on equity was 8.72 percent. *Id.*

SFPP argues that FERC acted arbitrarily or capriciously when it relied on the September 2008 data, instead of the April 2009 data, in setting SFPP's real return on equity. In particular, SFPP contends that FERC ignored its own "policy of using the most recent equity rate of return data in the record" and provided no explanation for its choice of the September 2008 data. SFPP's Br. 22-23. In FERC's view, the April 2009 data is not "representative of SFPP's cost of capital during the future periods the rates proposed in this case may be in effect." Opinion 511, 134 FERC ¶ 61,121, at ¶ 209. Specifically, that data "reflects the collapse of the stock market in late 2008 and early 2009" and a "minimal or negative inflation rate" not likely to continue into the future. *Id.*

We hold that it was reasonable for FERC to conclude that the April 2009 data was not representative of SFPP's long-term cost of capital. SFPP's argument that FERC has a bright-line policy of relying on the most recently available data to determine the real return on equity is incorrect. As FERC stated in *Trunkline Gas Co.*, the Commission "seeks to find the *most representative figures* on which to base rates." 90 FERC ¶ 61,017, at 61,049 (emphasis added). Therefore, FERC "may adopt test period estimates, or it may adopt other, more representative figures of historical costs . . . if it determines that these other figures are the best, most representative evidence of the pipeline's experience for the test period." *Id.* The real return on equity from the April 2009 data, 14.83 percent, is the highest among each of the

periods FERC considered, and only this data includes negative inflation. Had FERC decided to use the April 2009 data, SFPP would have been able to recoup essentially its entire *nominal* return on equity in its current rates, *see Williams Pipe Line Co.*, 31 FERC ¶ 61,377, at 61,833-34, despite the fact that the February 2010 and March 2010 data indicated that negative inflation was a short-term phenomenon. Substantial evidence therefore supported FERC's finding that the April 2009 data was not the most representative data for assessing SFPP's real return on equity, meaning that FERC did not engage in arbitrary-or-capricious decision-making by rejecting that data. *See* Opinion 511, 134 FERC ¶ 61,121, at ¶¶ 208-09; Opinion 511-A, 137 FERC ¶ 61,220, at ¶¶ 256-59.

However, this conclusion does not end the inquiry. In lieu of the more recently available April 2009 data, FERC relied instead on the September 2008 data to fix SFPP's real return on equity. *See* Opinion 511, 134 FERC ¶ 61,121, at ¶ 209. Because we agree with SFPP that FERC provided no reasoned explanation for its choice of the September 2008 data, we grant SFPP's petition for review and vacate FERC's orders with respect to this issue.

While there may be evidence to support the conclusion that the *nominal* return on equity for September 2008 was in line with historical trends, this evidence does not show that the *real* return on equity for that time period was representative of SFPP's costs. *See* Request for Rehearing of SFPP, L.P., No. IS08-390-002, at 11-12 (FERC Apr. 11, 2011) (SFPP conceding that the September 2008 nominal return on equity is "consistent with historical periods"); *see also* Opinion 511, 134 FERC ¶ 61,121, at ¶ 209; Opinion 511-A, 137 FERC ¶ 61,220, at ¶¶ 252-59. To the contrary, FERC provides only a cursory comparison of real returns on

equity from the September 2008 through the March 2010 time periods, and otherwise appears to have chosen the smallest real return on equity from the data available. *See* Opinion 511, 134 FERC ¶ 61,121, at ¶ 209. FERC was further unable to identify any such explanation in the record when pressed to do so at oral argument. *See* Oral Arg. Tr. 44:6-45:14. While "we are particularly deferential to the Commission's expertise with respect to ratemaking issues," *ExxonMobil*, 487 F.3d at 951 (citation and internal quotation marks omitted), FERC cannot rely in conclusory fashion on its knowledge and expertise without adequate support in the record. *See, e.g.*, *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 93 (D.C. Cir. 2010).

Because we agree that FERC engaged in arbitrary-or-capricious decision-making by adopting the September 2008 real return on equity without reasoned explanation, we need not reach SFPP's alternative argument that FERC improperly rejected SFPP's proposal to adopt an average real return on equity. We grant SFPP's petition on this issue.

## B. FERC'S INDEXING ANALYSIS WAS NOT ARBITRARY OR CAPRICIOUS

SFPP also argues that FERC engaged in arbitrary-or-capricious decision-making when it declined to apply the full amount of the 2009 rate index adjustment in calculating SFPP's rates and refunds for the period from July 1, 2009, through June 30, 2010. FERC responds that it complied with the plain text of its regulations when it found that granting SFPP a full indexed rate adjustment would result in unjust and unreasonable rates. We agree with FERC and deny SFPP's petition on this issue.

As part of the Energy Policy Act of 1992, Congress required FERC to "issue a final rule which establishes a simplified and generally applicable ratemaking methodology for oil pipelines in accordance with section 1(5) of part I of the [ICA]." Pub. L. No. 102-486, § 1801(a), 106 Stat. 2776, 3010. Congress also mandated that "the Commission . . . issue a final rule to streamline procedures of the Commission relating to oil pipeline rates in order to avoid unnecessary regulatory costs and delays." *Id.* § 1802(a). In response, FERC released a notice of proposed rulemaking on July 2, 1993, which set forth an indexing scheme for setting oil pipeline rates. *See Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992; Proposed Rulemaking*, 58 Fed. Reg. 37,671, at 37,672 (1993). FERC then issued on November 4, 1993, its final rule implementing the indexing scheme. *Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*, 58 Fed. Reg. 58,753, at 58,754 (1993).

Under the final rule, FERC required that oil pipelines utilize the indexing system for rate changes unless specified circumstances permit use of an alternative methodology. *Id.* at 58,757. "First, a cost-of-service showing may be utilized to change a rate whenever a pipeline can show that it has experienced uncontrollable circumstances that preclude recoupment of its costs through the indexing system." *Id.*; *see also* 18 C.F.R. § 342.4(a). "Second, whenever a pipeline can secure the agreement of all existing customers, it may file a rate change based on such a settlement." 58 Fed. Reg. at 58,757; *see also* 18 C.F.R. § 342.4(c). Finally, FERC permits market-based ratemaking if the pipeline can show that it "lacks significant market power in the markets in question . . . ." 58 Fed. Reg. at 58,757; *see also* 18 C.F.R. § 342.4(b).

At a general level, FERC's indexing methodology directs pipelines to file initial rates, usually reflecting their costs-of-service. 58 Fed. Reg. at 58,758. Based on the initial rate filings, FERC then calculates rate ceilings for future years based on the change in the Producer Price Index for Finished Goods. *Id.* at 58,760; *see also* 18 C.F.R. § 342.3(d)(2). Importantly, "the index establishes a *ceiling* on rates—it does not establish the rate itself." 58 Fed. Reg. at 58,759. In other words, "a company is not required to charge the ceiling rate, and if it does not, it may adjust its rates upwards to the ceiling at any time during the year upon filing of the requisite data . . . and upon giving the appropriate notice." *Id.* at 58,761. For future years, the index "is cumulative[, meaning that] . . . the index applies to the applicable ceiling rate, which is required to be calculated each year, not to the actual rate charged." *Id.* at 58,762. The stated purpose of this regime is to "preserve[] the value of just and reasonable rates in real economic terms [by] . . . tak[ing] into account inflation, thus allowing the nominal level of rates to rise in order to preserve their real value in real terms." *Id.* at 58,759.

In this case, SFPP filed cost-of-service rates, effective August 1, 2008, proposing to increase the rates charged on its West Line "based upon the cost of providing the service covered by the rate . . . ." 18 C.F.R. § 342.4(a). Because this rate took effect during the 2008 index year—i.e., between July 1, 2008, and June 30, 2009—it also "constitute[d] the applicable ceiling level for that index year." *Id.* § 342.3(d)(5); *see also id.* § 342.3(c) (defining the index year as "the period from July 1 to June 30"). Therefore, to compute the ceiling level for the 2009 index year—i.e., between July 1, 2009, and June 30, 2010—SFPP "multipl[ied] the previous index year's [2008's] ceiling level by the most recent index published by [FERC]." *Id.* § 342.3(d)(1). The index for 2009 was 7.6025 percent.

*Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*, 127 FERC ¶ 61,184 (2009). SFPP therefore contends that it has the right to apply this full index when calculating its 2009 rates. FERC argues that, because SFPP's cost-of-service rates for 2008 already partially "accounted for the changes in costs associated with the index increase," Opinion 511-A, 137 FERC ¶ 61,220, at ¶ 407, SFPP can only apply that portion of the 2009 index "not reflected in the cost of service adopted by Opinion No. 511 or the rates SFPP must establish [in Opinion No. 511-A]," *id.* ¶ 405. In particular, FERC permitted SFPP to use an index of 1.9006 percent, "correspond[ing] to the three months of 2008 cost changes that are outside" the period of costs already covered by SFPP's proposed rates. *Id.* In other words, FERC limited SFPP's 2009 index to twenty-five percent of the published value for that index year.

Were this information all that the Court had to consider, SFPP's argument that FERC "ignore[d] its regulations, which have the force of law," SFPP's Br. 35, might be plausible in light of the plain text of FERC's indexing regulations, *see* 18 C.F.R. § 342.3. But the analysis is only half-complete. "[M]erely because the Commission regulations permit SFPP to request the index increase does not mean that the Commission is bound to accept the indexed rate increase." Opinion 511-A, 137 FERC ¶ 61,220, at ¶ 407. In particular, "persons with a substantial economic interest in the tariff filing may file a protest to a tariff filing pursuant to the Interstate Commerce Act." 18 C.F.R. § 343.2(b). A protest to a proposed rate under 18 C.F.R. § 343.2 must allege "reasonable grounds for asserting that the rate violates the applicable ceiling level, or that the rate increase is so substantially in excess of the actual cost increases incurred by the carrier that the rate is unjust and unreasonable, or that the rate decrease is so substantially less than the actual cost

decrease incurred by the carrier that the rate is unjust and unreasonable." *Id.* § 343.2(c)(1). In this case, the Shippers did file protests to SFPP's indexed rates for the 2009 index year. *See* Protest and Comments of Chevron Products Company, ConocoPhillips Company, Continental Airlines, Inc., Northwest Airlines, Inc., Southwest Airlines Co., US Airways, Inc., and Valero Marketing and Supply Company on SFPP, L.P. Compliance Filing ("Protest I"), Nos. IS08-390-002, IS08-390-006, IS11-338-000 (FERC June 15, 2011); Protest of ExxonMobil Oil Corporation and BP West Coast Products LLC of Compliance Filing Implementing Opinion No. 511 ("Protest II"), No. IS08-390-006 (FERC June 15, 2011). Therein, they argued that because "[t]he 2009 index is based on [FERC's] computation of industry-wide cost increases between 2007 and 2008[,]" SFPP should not be permitted to double-recover its costs by combining its 2008 cost-of-service rates with proposed 2009 indexed rates. Protest II, at 12. Equivalently, the Shippers alleged that SFPP's 2009 indexed rate increase was "substantially in excess of the actual cost increases incurred by [SFPP]" during 2008. 18 C.F.R. § 343.2(c)(1). FERC agreed. *See* Opinion 511-A, 137 FERC ¶ 61,220, at ¶ 411; Opinion 511-B, 150 FERC ¶ 61,096, at ¶¶ 27-33. "Because the subject of our scrutiny is a ratemaking—and thus an agency decision involving complex industry analyses and difficult policy choices—the court will be particularly deferential to the Commission's expertise." *Ass'n of Oil Pipe Lines*, 83 F.3d at 1431. With this principle in mind, we discern no error in FERC's decision-making.

SFPP's principal retort to this otherwise straightforward application of FERC's regulations is that the alleged purpose of FERC's indexing procedures is to permit a pipeline to capture future inflation-based cost adjustments, not prior-year cost-of-service changes. FERC responds, somewhat

cryptically, that indexing "allows rates to track inflation in the general economy, essentially preserving pipelines' existing rates in real economic terms." FERC's Br. 43.

SFPP's argument is irrelevant to this case. Admittedly, whether FERC's indexing mechanism is retrospective or prospective is unclear. For example, FERC has previously described the purpose of indexing as "preserv[ing] the value of just and reasonable rates in real economic terms . . . [by] tak[ing] into account inflation, thus allowing the nominal level of rates to rise in order to preserve their real value in real terms." *Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*, 58 Fed. Reg. at 58,759; *see also SFPP, L.P.*, 117 FERC ¶ 61,271, at 62,337 (2006). By contrast, we have stated that indexing "enable[s] pipelines to recover costs by allowing pipelines to raise rates at the same pace as they are predicted to experience cost increases." *Ass'n of Oil Pipe Lines*, 83 F.3d at 1430. However, once a party files a protest to a pipeline's proposed rates, FERC's regulations state that the Commission will compare the "actual cost increases *incurred* by the carrier" with the proposed rate increase. 18 C.F.R. § 343.2(c)(1) (emphasis added). FERC made this comparison when it noted that SFPP would effectively double-recover its 2008 costs were it to receive the full 2009 index. *See* Opinion 511-A, 137 FERC ¶ 61,220, at ¶¶ 409-11; Opinion 511-B, 150 FERC ¶ 61,096, at ¶¶ 27-33. While admittedly FERC's analysis was less quantitative than in prior rate proceedings, we hold that FERC provided sufficient justification for its decision to reduce SFPP's 2009 index to one-quarter of the published value. *See* Opinion 511-A, 137 FERC ¶ 61,220, at ¶ 411 n.687; *SFPP, L.P.*, 135 FERC ¶ 61,274, at 62,513 ¶¶ 11-12 (2011) (describing the so-called "percentage comparison test"); *see also SFPP, L.P.*, 117 FERC ¶ 61,271, at 62,337 ¶ 5 (denying indexed rate increase to SFPP's East Line rates where base

rates already "recover[ed] all the relevant operating and capital costs").

SFPP's reliance on prior FERC proceedings involving indexing, *see, e.g.*, Opinion 435, 86 FERC ¶ 61,022, at 61,085 (2000); Opinion 435-A, 91 FERC ¶ 61,135, at 61,516 (2000), is inapposite. As SFPP admitted during oral argument, those proceedings at most permitted FERC to apply the full index to SFPP's rates but did not compel it. *See* Oral Arg. Tr. 22:12-:15. Notably, FERC did not address in those cases whether the indexed rates were "so substantially in excess of the actual cost increases incurred by the carrier," 18 C.F.R. § 343.2(c)(1), which it has done here. We otherwise agree with FERC that SFPP "has failed to demonstrate that [FERC's] determination . . . is inconsistent with precedent." FERC's Br. 48.

We therefore deny SFPP's petition on this issue.

## C. FERC MUST DEMONSTRATE THAT THERE IS NO DOUBLE RECOVERY OF TAXES FOR PARTNERSHIP PIPELINES

The Shippers argue that FERC engaged in arbitrary-or-capricious decision-making when it granted an income tax allowance to SFPP. Specifically, the Shippers note that, as a partnership pipeline, SFPP is not taxed at the pipeline level. Because FERC's discounted cash flow return on equity already ensures a sufficient after-tax return to attract investment to the pipeline, they argue, the tax allowance results in "double recovery" of taxes to SFPP's partners. In FERC's view, we already decided this issue in *ExxonMobil*, where we held that FERC's policy of permitting partnership pipelines to receive a tax allowance was "not unreasonable" in light of "FERC's expert judgment about the best way to

equalize after-tax returns for partnerships and corporations." 487 F.3d at 953. FERC therefore posits that the Shippers' petition in this case is an impermissible collateral attack on our decision in *ExxonMobil*. Further, FERC denies that granting a tax allowance to SFPP results in a double-recovery of taxes and avers that any disparity in after-tax returns to partners or shareholders arises from the Internal Revenue Code, not from FERC's tax allowance policy. Because we reserved the issue of whether the combination of the discounted cash flow return on equity and the tax allowance results in double recovery of taxes for partnership pipelines, we disagree with FERC's collateral attack argument. Nonetheless, we acknowledge that our opinion in *ExxonMobil* stated that it may be reasonable for FERC to grant a tax allowance to partnership pipelines. However, because FERC failed to demonstrate that there is no double-recovery of taxes for partnership, as opposed to corporate, pipelines, we hold that FERC acted arbitrarily or capriciously. We therefore grant the Shippers' petition.

As all parties acknowledge, this case is not the first time that we have considered FERC's tax allowance policy for oil pipelines. Until our decision in *BP West Coast*, 374 F.3d at 1293, FERC relied on the so-called *Lakehead* policy when granting tax allowances. Named for the FERC decision in which the Commission formalized the policy, *see Lakehead Pipe Line Co.*, 71 FERC ¶ 61,338, at 62,314-15 (1995), the *Lakehead* policy addressed the situation in which a partnership pipeline has both corporate-partners and individual-partners. FERC therein concluded:

> When partnership interests are held by corporations, the partnership is entitled to a tax allowance in its cost-of-service for those corporate interests because the tax cost will be passed on to the corporate owners who must pay corporate income taxes on their allocated share of income directly on their tax returns. . . . However, the Commission concludes that Lakehead should not receive an income tax allowance with respect to income attributable to the limited partnership interests held by individuals. This is because those individuals do not pay a corporate income tax.

*Id.*

We reviewed the *Lakehead* policy in *BP West Coast* and held that "[w]e cannot conclude that FERC's inclusion of the income tax allowance in SFPP's rates is the product of reasoned decisionmaking." 374 F.3d at 1288. In that case, we started from the principle "that the regulating commission is to set rates in such a fashion that the regulated entity yields returns for its investors commensurate with returns expected from an enterprise of like risks." *Id.* at 1290. Consistent with this principle, we rejected FERC's justifications for its *Lakehead* policy and held that "where there is no tax generated by the regulated entity, either standing alone or as part of a consolidated corporate group, the regulator cannot create a phantom tax in order to create an allowance to pass through to the rate payer." *Id.* at 1291.

Concededly, our use of the term "phantom tax" in *BP West Coast* lacked precision. This was made apparent in *ExxonMobil*, as several shipper-petitioners challenged FERC's revised tax allowance policy, which granted a full income tax allowance to both partnership pipelines and

corporate pipelines, regardless of the identities of the partners or shareholders. 487 F.3d at 950. We rejected the petitioners' arguments in that case, stating that because "investors in a limited partnership are required to pay tax on their distributive shares of the partnership income, even if they do not receive a cash distribution[,] . . . the income received from a limited partnership should be allocated to the pipeline and included in the regulated entity's cost-of-service." *Id.* at 954. FERC did not create a "phantom tax" because it did not arbitrarily distinguish between corporate and individual partners in a partnership pipeline, and the Commission adequately explained why partner taxes could be considered a pipeline cost.

In this case, the Shippers challenge the same tax allowance policy at issue in *ExxonMobil*. Given that nothing has changed with regard to this policy, FERC's argument that the Shippers present an impermissible collateral attack to our *ExxonMobil* decision is, on first consideration, conceivable. However, as the Shippers mention in their reply brief, FERC averred during briefing in *ExxonMobil* that it was addressing the double recovery issue in a separate proceeding. *See* Br. of Resp't at 30-31, *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945 (D.C. Cir. 2007) (Nos. 04-1102 *et al.*). While we did not expressly reserve the issue in our *ExxonMobil* opinion, the fact that FERC took this position both in *ExxonMobil* and in an accompanying case, *see* Br. of Resp't at 29-30, *Canadian Ass'n of Petroleum Producers v. FERC*, 487 F.3d 973 (D.C. Cir. 2007) (No. 05-1382), reflects our implicit reservation of the question. To clarify, we held in *ExxonMobil* that, to the extent FERC has a reasoned basis for granting a tax allowance to partnership pipelines, it may do so. 487 F.3d at 955. The Shippers now challenge whether such a reasoned basis exists based on grounds that FERC agreed were not at

issue in the prior case. We therefore hold that the Shippers' petition is not a collateral attack on that decision.

As to the merits, we hold that FERC has not provided sufficient justification for its conclusion that there is no double recovery of taxes for partnership pipelines receiving a tax allowance in addition to the discounted cash flow return on equity. Despite their attempts to inundate the record with competing mathematical analyses of whether a double recovery of taxes for partnership pipelines exists, the parties do not disagree on the essential facts. First, unlike a corporate pipeline, a partnership pipeline incurs no taxes, except those imputed from its partners, at the entity level. *See* 26 U.S.C. § 7704(d)(1)(E). Second, the discounted cash flow return on equity determines the pre-tax investor return required to attract investment, irrespective of whether the regulated entity is a partnership or a corporate pipeline. *See* Opinion 511, 134 FERC ¶ 61,121, at ¶¶ 243-44; Shippers' Br. 6; *see also supra* Part II.A (discussing the mechanics of the discounted cash flow methodology). Third, with a tax allowance, a partner in a partnership pipeline will receive a higher after-tax return than a shareholder in a corporate pipeline, at least in the short term before adjustments can occur in the investment market. *See* FERC's Br. 29; Shippers' Br. 34-35; Oral Arg. Tr. 32:17-33:2.

These facts support the conclusion that granting a tax allowance to partnership pipelines results in inequitable returns for partners in those pipelines as compared to shareholders in corporate pipelines. Because the Supreme Court has instructed that "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks," FERC has not shown that the resulting rates under FERC's current policy are "just and reasonable." *Hope Nat. Gas Co.*, 320 U.S. at 603. FERC

attempts to circumvent this deduction by arguing, first, that there is no "gross-up" in the return rate for partnership pipelines to account for income taxes, and, second, that any disparate treatment between partners in partnership pipelines and shareholders in corporate pipelines is the result of the Internal Revenue Code, not FERC's tax allowance policy. These arguments, which are two sides of the same metaphorical coin, are not persuasive.

The crux of FERC's "gross-up" theory is that "in the context of Commission rate design[,]" Opinion 511-A, 137 FERC ¶ 61,220, at ¶ 290, "the Commission does not gross up a jurisdictional entity's operating revenues or return to cover the income taxes that must be paid to obtain its after-tax return," *id.* ¶ 280. What the Commission apparently means by this rather obscure statement is that it imputes the income taxes paid by partners in a partnership pipeline to the pipeline itself, meaning that an income tax allowance is then necessary to equalize the after-tax "entity-level" rates of return for partnership and corporate pipelines. *See* Opinion 511, 134 FERC ¶ 61,121, at ¶¶ 241-50; *see also* Opinion 511-A, 137 FERC ¶ 61,220, at ¶ 319. Of course, when one then considers the after-tax returns to partners or shareholders, the necessary conclusion is that partners in a partnership pipeline receive a windfall compared to shareholders in a corporate pipeline, a point which FERC concedes. *See* FERC's Br. at 29; Oral Arg. Tr. 32:17-33:2. FERC, in a form of Orwellian doublethink, attributes this disparity in returns to the Internal Revenue Code while simultaneously denying that double-recovery exists. *See* Opinion 511-A, 137 FERC ¶ 61,220, at ¶ 315.

True, FERC has a justifiable basis for its attribution of partner taxes to the partnership pipeline. In *ExxonMobil*, we acknowledged that "investors in a limited partnership are

required to pay tax on their distributive shares of the partnership income, even if they do not receive a cash distribution." 487 F.3d at 954. By contrast, "a shareholder of a corporation is generally taxed on the amount of the cash dividend actually received." *Id.* For this reason, allocation of partner-level taxes to a partnership pipeline may not result in a "phantom tax" of the type we rejected in *BP West Coast*. However, our holding in *ExxonMobil* did not absolve FERC of its obligation to ensure "commensurate . . . returns on investments" for "equity owner[s]" as required under *Hope Natural Gas*, 320 U.S. at 603. Even if FERC elects to impute partner taxes to the partnership pipeline entity, it must still ensure parity between equity owners in partnership and corporate pipelines. FERC's failure to do so in this case is therefore arbitrary or capricious.

The remaining issue is the appropriate remedy. The Shippers do not request that we overturn our decision in *ExxonMobil*, which we are unable to do in any case absent an en banc decision from the Court. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996). But we also believe such action is unnecessary. When questioned at oral argument, FERC conceded that it might be able to remove any duplicative tax recovery for partnership pipelines directly from the discounted cash flow return on equity. *See* Oral Arg. Tr. 36:3-:10. We note also that, prior to *ExxonMobil*, FERC considered the possibility of eliminating all income tax allowances and setting rates based on pre-tax returns. *See Policy Statement on Income Tax Allowances*, 111 FERC ¶ 61,139, at 61,741 (2005). To the extent that FERC can provide a reasoned basis for such a policy, we do not read our decision in *ExxonMobil* as foreclosing that option. *See* 487 F.3d at 955 ("Arguably, a fair return on equity might have been afforded if FERC had chosen the fourth alternative of computing return on pretax income and providing no tax

allowance at all for the pipeline owners."). We therefore grant the Shippers' petition, vacate FERC's orders with respect to this issue, and remand for FERC to consider these or other mechanisms for which the Commission can demonstrate that there is no double recovery.

## III.   CONCLUSION

For the reasons stated herein, the Court: (i) grants-in-part SFPP's petition with respect to the choice of data for assessing SFPP's real return on equity, vacates FERC's orders accordingly, and remands for further proceedings consistent with this opinion; (ii) denies-in-part SFPP's petition with respect to the indexing issue; and (iii) grants the Shippers' petition, vacates FERC's orders with respect to the double recovery issue, and remands to FERC for further proceedings consistent with this opinion.

*So ordered.*