**TOWN OF NORWOOD,
MASSACHUSETTS,
Petitioner**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.**

New England Power Company,
Intervenor.

No. 93–1785.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 27, 1995.

Decided May 12, 1995.

Charles F. Wheatley, Jr., argued the cause for petitioner. With him on the briefs were Don C. Uthus and Timothy P. Ingram. Philip B. Malter entered an appearance.

Timm L. Abendroth, Atty., F.E.R.C., Regulatory argued the cause for respondent. With him on the brief was Jerome M. Feit, Sol., F.E.R.C.

Kenneth G. Jaffe, argued the cause for intervenor. With him on the brief were Edward Berlin and Michael E. Ward.

Irwin A. Popowsky and Denise C. Goulet, were on the brief for amicus curiae Nat. Ass'n of State Utility Consumer Advocates.

Before WALD, SENTELLE and ROGERS, Circuit Judges.

WALD, Circuit Judge:

This case involves the ratemaking treatment of post-retirement benefits other than pensions, which consist largely of retiree medical benefits ("PBOPs" or "retiree medical benefits"). Historically, PBOPs have been reported on a cash basis for both accounting and ratemaking purposes. In 1990, the Financial Accounting Standards Board ("FASB") instructed companies to switch to accrual accounting for PBOPs, requiring companies to account now for the post-retirement benefits they expect to pay in the future to their current employees. In its 1991 rate proposal to the Federal Energy Regulatory Commission ("FERC" or "Commission"), New England Power ("NEP") requested a raise in its rates based in part on the switch to accrual accounting of PBOPs. FERC granted the request, *see* 61 F.E.R.C. ¶ 61,331 (1992), *reh'g denied,* 65 F.E.R.C. ¶ 61,036 (1993), and the Town of Norwood ("Norwood") challenges the approval of accrual treatment of PBOPs for ratemaking purposes.

I. BACKGROUND

Under the pay-as-you-go approach to PBOPs, utilities incorporate into their accounts and rates only the actual payment of PBOPs to current retirees; they do not account for their future obligations to currently active employees. Under the accrual method, by contrast, the company incorporates into its current costs and rates an estimate of

the future retiree medical benefits that it has promised to its present employees. In December, 1990, the FASB directed all companies subject to the FASB accounting standards with over 500 plan participants to switch to accrual accounting for post-retirement medical benefits. *See* Statement of Financial Accounting Standards No. 106, *Employers' Accounting for Postretirement Benefits Other Than Pensions* ("FAS 106"), *reprinted in* Joint Appendix ("J.A.") at 106–36.

FAS 106 proceeds from the "basic premise of generally accepted accounting principles that accrual accounting provides more relevant and useful information than does cash basis accounting." FAS 106 at 2, *reprinted in* J.A. at 108. In particular, the FASB concluded that the retirement benefits of current employees are best conceived of as deferred costs of their current employment— "[i]n exchange for the current services provided by the employee, the employer promises to provide, in addition to current wages and other benefits, health and other welfare benefits after the employee retires," *id.* at 1, *reprinted in* J.A. at 107—and thus properly identified as a cost of current employment. Such reporting, the FASB concluded, would "enhance the relevance and representational faithfulness" of financial statements. *Id.*

For the near future, the accrual method is likely to result in greater liability than the cash method because recent factors "such as spiraling medical costs, early retirements, an aging population, and the accumulation of benefits obligations" have raised the "potential future liability for PBOP costs ... dramatically." 61 F.E.R.C. ¶ 61,331 at 62,207. In addition, when a company switches from pay-as-you-go to accrual accounting it incurs a large and sudden liability, the transition obligation. At the time of transition, the company will have already accumulated a significant future liability for the retirement medical benefits of existing employees that it has never accounted for in its books. Had the company been using accrual accounting all along, it would have accounted for these future costs to its employees as they accrued. When that same company switches to accrual accounting, it has to somehow provide for this deferred cost. FAS 106 authorizes companies to either place this liability on their books immediately or to amortize it over a 20–year period.

In this case, NEP filed a rate request incorporating a switch to accrual accounting. As part of this switch, NEP petitioned to collect the transition costs—that amount of liability *already* accrued—from ratepayers over the next 20 years. The Administrative Law Judge ("ALJ") denied the request on the grounds that future PBOPs were too difficult to estimate and that the transition obligation imposed excessive intergenerational subsidization. 60 F.E.R.C. ¶ 63,006 (1992). The Commission reversed, 61 F.E.R.C. ¶ 61,331 (1992), and denied a subsequent motion for rehearing, 65 F.E.R.C. ¶ 61,036 (1993).

Although FAS 106 applies to regulated as well as unregulated industries for accounting purposes,[1] the accounting approach does not necessarily dictate the ratemaking approach, and the Commission did not hold itself to be bound by FAS 106 for ratemaking purposes.[2] Rather, it independently assessed the merits of accrual accounting and concluded that accrual accounting was preferable because "the

---

1. Although the FASB standards do not have official force of law, the American Institute of Certified Public Accountants adopts them as binding and the Securities and Exchange Commission has declared them to "hav[e] substantial authoritative support." Testimony of NEP Witness William S. Reardon at 4, *reprinted in* J.A. at 94.

2. In some circumstances, it is possible to follow different methods for accounting and ratemaking purposes through the use of a "regulatory asset." As explained above, the accrual method is likely to result in greater liability in the near future and lower liability in the more distant future. Norwood argues that instead of allowing NEP to

employ the accrual method in setting rates, the Commission could authorize the utility to record a "regulatory asset," a paper asset that allows the utility to make up the difference between the pay-as-you-go and accrual methods on the books alone. It appears from the record that the FASB standards only allow the use of a regulatory asset in certain circumstances. *See* Testimony of NEP Witness William S. Reardon at 21–23, *reprinted in* J.A. at 103–05. The Commission did not address whether it would be possible to use a regulatory asset in this case because it concluded that the accrual method was preferable at any rate.

customers receiving the benefits of the employees' work should pay the associated costs." 61 F.E.R.C. ¶ 61,331 at 62,213. It granted NEP's petition on the conditions that (1) NEP place all funds collected to meet the accrued obligations in an irrevocable trust and (2) if "overfunding ever occurs, NEP [must] reserve any over-collection expressly for the benefit of customers, through reduced expense projections in subsequent filings." *Id.*

Norwood offers two main challenges to the use of accrual accounting in ratemaking for retiree medical benefits. First, it argues that estimation of these benefits is so uncertain and speculative that it cannot meet the statutory requirement that rates be "just and reasonable." 16 U.S.C. § 824d(a). Second, it challenges the imposition of the "transition obligation" on the coming generation of ratepayers as both (a) improper inter-generational subsidization and (b) impermissible retroactive ratemaking. In addition, Norwood argues that the proceedings below were tainted by *ex parte* contacts.

## II. Ability to Estimate Costs

■ First, we take up Norwood's challenge that forecasts of future retiree medical costs are too speculative and difficult to ascertain.

The Commission's policy is to allow recovery of only those costs that are "known and measurable." 61 F.E.R.C. ¶ 61,331 at 62,216. In this case, the Commission concluded that the cost of post-retirement medical benefits can be calculated with "sufficient accuracy to be considered known and measurable." *Id.* at 62,217.

The cost of currently accruing PBOPs depends largely on future medical costs, which admittedly must be estimated. As Norwood points out, this estimation is inherently subject to uncertainty. For instance, NEP's actuary estimated an average medical inflation rate of 12% for the years 1991–95, but in 1991 it was only 2.71%. The Commission, however, routinely faces circumstances in which ratemaking requires estimations and future cost predictions. These are matters largely of policy and expertise. In this case,

the Commission neither exceeded its discretion nor deviated from past practice in concluding that the necessary estimations in this case are within the bounds of the "known and measurable" standard.

Long-range estimates are an integral feature of ratemaking and financial analysis in general, and we have regularly approved reliance on admittedly imperfect future cost estimates. In *Towns of Concord, Norwood and Wellesley v. FERC*, 729 F.2d 824 (D.C.Cir. 1984), for instance, this court upheld the inclusion in rates of estimates of future spent nuclear fuel disposal costs against charges that the costs were too distant and uncertain. The estimations necessary for accrual accounting are not out of line with the estimations that are a standard feature of ratemaking.

In addition, as the Commission noted, there are sturdy protections in the facts that (1) the estimate will be revised with each new rate application, and (2) any over-collection resulting from an overestimate must be applied to reduce future rates. Thus, estimation problems, though not insubstantial, do not create a long-term danger of unfairness. Given the choice between relying on imperfect but revisable long-range estimation and failing to recognize at the present time what can properly be characterized as deferred costs of current employment, FERC was well within its discretion in authorizing rates based on the long-term estimates.

## III. The Transition Obligation

Under NEP's rate proposal, it will recover the cost of the transition obligation—the accumulated but unrecognized obligation to current employees—in rates over the next twenty years. Norwood challenges this arrangement, arguing that imposing the transition obligation on ratepayers over the next twenty years unfairly saddles them with a double obligation for both past and current accrual costs and that it constitutes unlawful retroactive ratemaking.

### A. The "Matching" Principle

■ The Commission follows a "general ratemaking principle" of "matching," by

which ratepayers are charged with the costs of producing the service they receive. 61 F.E.R.C. at 62,214. The Commission's overall goal in authorizing the switch to accrual accounting is to conform the practice to the matching principle. The accrual method charges current customers for the costs associated with present employment. Under the pay-as-you-go method, by contrast, the matching principle is consistently violated, because current ratepayers are paying for retiree medical costs associated with past service.

The transition obligation, however, entails some violation of the matching principle. Under the new accrual method, the costs of the transition obligation are now deemed to have accrued in the past, and thus are associated with past service. The Commission recognized that "[c]harging current ratepayers for the transition obligation is unquestionably charging for costs incurred to provide service to other, earlier ratepayers." 61 F.E.R.C. ¶ 61,331 at 62,215. It concluded, however, that the transition obligation was not fatal to the switch because (1) the switch to the accrual method is overall *more* faithful to the matching principle, and (2) under Commission policy, some violation of the matching principle is acceptable when ratemaking conventions involving future expenses change. In particular, when ratemaking conventions change to recognize a previously unrecognized cost, some of which has already accumulated, the Commission allows the utility to make up for the amount that has already accumulated: the "make-up" provision "is a permissible way to make a utility whole for properly deferred, prior period costs." *Id.*

The Commission has consistently allowed "make-up" provisions for prior deferred expenses similar to the one at issue here. For instance, the Commission has authorized utilities to amortize over ten years the costs of disposing of previously spent nuclear fuel once the utilities realize that the fuel must be disposed of rather than reprocessed as originally planned, *see Virginia Electric & Power Co.,* 15 F.E.R.C. ¶ 61,052 at 61,105, *modified,* 17 F.E.R.C. ¶ 61,150 (1981), and has done the same with respect to previously unrecognized nuclear decommissioning costs. 61 F.E.R.C.

¶ 61,331 at 62,215 (citing cases). Thus, the Commission's treatment of the transition obligation is squarely within Commission precedent, which allows exceptions such as this one to the general "matching" principle.

### B. *Retroactivity*

 Nor does the transition obligation violate the proscription against retroactive ratemaking. The retroactive ratemaking doctrine prohibits the Commission from authorizing or requiring a utility to adjust current rates to make up for past errors in projections. If a utility includes an estimate of certain costs in its rates and subsequently finds out that the estimate was too low, it cannot adjust *future* rates to "recoup past losses." *City of Piqua v. FERC,* 610 F.2d 950, 954 (D.C.Cir.1979) (quoting *Nader v. FCC,* 520 F.2d 182, 202 (D.C.Cir.1975)). As detailed below, however, the transition obligation does not run afoul of the retroactive ratemaking proscription, because NEP has not shifted any costs that it tried but failed to collect in the past: it *always* planned to collect these costs from future ratepayers, the only shift is timing within the future.

This court has upheld a transition provision much the same as the one at issue here against charges of retroactive ratemaking on the grounds that the "past" costs collected during the transition were costs that the utility had *always* planned to charge to future ratepayers. Thus, in *Public Systems v. FERC,* 709 F.2d 73, 84–85 (D.C.Cir.1983), we approved FERC's transition treatment of the switch from flow-through to tax normalization accounting. Like the transition at issue in this case, that transition required companies to collect money from future ratepayers that they would have accumulated from past ratepayers if they had been using tax normalization all along.

Both the shift to tax normalization and the shift to accrual accounting result in a sudden deficit that must be made up. To understand this parallel, a brief and schematic description of tax normalization is necessary. Tax normalization involves the accounting treatment of accelerated depreciation. For tax purposes, companies are authorized to use accelerated depreciation in certain cir-

cumstances. Under accelerated depreciation, the company pays *less* tax than it would under straight-line depreciation in the early years of the life of the equipment, and *more* tax than it would under straight-line depreciation in the later years of the life of the equipment.

This difference between accelerated and straight-line depreciation can be accounted for in two different ways. Under flow-through accounting, the company passes the difference between straight-line and accelerated depreciation directly to the ratepayers: ratepayers get the surplus between accelerated and straight-line depreciation in the early years, and they are charged for the deficit in the later years. Under tax normalization, by contrast, ratepayers are shielded from these effects of accelerated depreciation. The company charges the ratepayers the tax that they would be responsible for under straight-line depreciation throughout the life of the equipment. Thus, in the early years, the company collects more in rates than it pays in taxes to the IRS; in the later years, it collects *less* in rates than it pays in taxes. The company holds onto the surplus from the early years in a *deferred tax account*, and uses this surplus to make up for the deficit in the later years.

When the company *switches* from flow-through to tax normalization accounting, it does not have any accumulated surplus in its deferred tax account. Thus, for older equipment in its last years, the company owes more money in taxes than it can collect from its ratepayers under its new tax normalization procedure. The transition requires it to make up for this underfunding by collecting the money that it would have accumulated in its deferred tax account if it had been using tax normalization all along[3]—in much the same way that the transition from pay-as-you-go to accrual accounting requires the company to make up for money that would have been accumulated by that point if it had been using accrual accounting all along.

When FERC ordered the switch from flow-through to tax normalization accounting, it included a make-up provision, allowing utilities to collect over time that amount of money for their deferred tax account that they would have had if they had been using tax normalization all along. This court upheld the make-up provision against a charge that it constituted retroactive ratemaking:

> Petitioners argue that the make-up provision is illegal retroactive ratemaking. Unlike the agency action in the cases cited by petitioners, however, the provision does not adjust for shortfalls in prior rates. It only adjusts future rates so that tax costs will not fall disproportionately on one ratepayer generation. Ratepayers are not charged for a greater tax allowance under the provision than they otherwise would be; they merely incur the cost over a different time period.

*Public Systems,* 709 F.2d at 85.

In sum, the switch from flow-through to tax normalization accounting is very similar to the switch from pay-as-you-go to accrual accounting. In each case, there is a quantity of money that the company (a) planned to collect from future ratepayers under the earlier method, but (b) would have collected from past ratepayers if it had been using the new method all along. In *Public Systems,* this court held that it is not retroactive ratemaking for the company to collect this quantity of money from future ratepayers over a set period of time because it was expected all along that this money would be collected from future ratepayers. The make-up provision changed only the timing of collection; it did not burden future ratepayers with charges that they would never have borne under the old system. By the same reasoning, the transition provision at issue in this case is not retroactive ratemaking.

Similarly, although Norwood points to *Public Service Co. v. FERC,* 600 F.2d 944 (D.C.Cir.), *cert. denied,* 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979), to support its claim of retroactive ratemaking, that case

---

**3.** Although everything that goes into the tax normalization account ultimately comes back out to pay the deficit in the later years of the life of equipment, a growing company—continually making new investments—generally maintains a positive balance in the tax normalization account.

actually supports FERC's position. In *Public Service*, this court concluded that the collection of *deferred* costs did not constitute retroactive ratemaking so long as those costs were intended to be deferred all along. *See id.* at 950. Only if the company is not, in fact, collecting deferred costs, but instead attempting to make up for errors in earlier approximations of actual costs, does it engage in impermissible retroactive ratemaking. *See id.* '

*Public Service* involved a company's transition between two methods of setting fuel costs. Under its original system, the company used a formula based on prior fuel costs to compute current fuel charges. Under the new system, the company used a formula that incorporated the actual cost of the fuel in the current billing month. In making the transition, the company sought to impose a temporary surcharge to make up for what it described as "deferred charges" still due under the earlier system: charges to make up the difference between the estimated and the actual cost. FERC disallowed this surcharge as retroactive ratemaking, and this court agreed.

This court explained that if the old system had simply been one of deferred billing, in which the intent all along was that the purchaser should pay the actual cost-of-service, but, due to difficulties in ascertaining that cost, the purchaser paid the prior cost on delivery and subsequently made up the difference—or deferred charge—then the companies could have collected the deferred costs after the transition. The court concluded, however, that this was *not* the intent of the old system. Rather, the old system used a formula *based on* the prior cost, but it was *intended* to approximate the actual cost. Because the old system was designed as a proxy, the company could not now go back and say, "Our estimate was wrong, so make up the difference now." Thus, in the court's words, "[w]hether approval of the proposed surcharges would be retroactive ratemaking depends upon one's characterization of the superseded fuel adjustment clauses":

> If those clauses are viewed (as [the company does]) as cost of service tariffs with deferred billing, then the requested surcharges—which merely assure that the utilities recover their fuel costs—would not be retroactive rate increases. But if the superseded clauses are viewed (as the Commission does) as fixed rate tariffs which used past costs as a proxy for the actual current cost, then the proposed surcharges would indeed be retroactive rate increases.

600 F.2d at 950. The court agreed with FERC that the earlier charges were intended as proxies for the actual costs and that the surcharges were thus impermissible retroactive ratemaking.

Thus, it is permissible for a company to *defer* collection of certain charges until the point at which they become ascertainable, so long as the ratepayers have notice that the charges will be collected in the future. It is not, however, permissible for a company to devise a formula intended to *estimate* actual charges—to serve as a proxy for actual charges—and then go back and collect any shortfall caused by imperfections in that proxy.

In this case, no party contends that NEP collected pension medical benefits on a pay-as-you-go basis as a *proxy* for the actual pension medical liability accruing to its current employees. Norwood argues only that the pay-as-you-go costs *can* serve as a proxy, not that they were *intended* to serve as a proxy. Thus, Norwood points to the finding of the ALJ that:

> [H]owever it may offend purists in the accounting profession, the pay-as-you-go costs can be accepted as an approximation of the costs attributable to the current service period, *even if they are not calculated on that basis.*

60 F.E.R.C. ¶ 63,006 at 65,084 (emphasis added). This claim that pay-as-you-go costs can serve as a proxy for the costs attributable to the current service period is highly contestable,[4] and at any rate irrelevant, because the relevant inquiry under *Public Ser-*

---

4. In fact, Norwood argues only that pay-as-you-go costs will approximate later costs "if we assume that NEP, in response to the market place for labor, will limit its exposure." Norwood Brief at 28.

*vice* is whether the pay-as-you-go costs were *designed* as a proxy for actual costs accruing for current employees. On that score, no one claims that NEP intended the pay-as-you-go costs as a proxy for the actual costs it was accruing.

In sum, because the transition provision only shifts the timing of collection of PBOP costs among future ratepayers, it does not constitute retroactive ratemaking under the law of this circuit.

## IV. *Ex Parte* Contacts

■ Finally, Norwood argues that *ex parte* contacts tainted the proceedings below. NEP's rate filing case was before the Commission between September, 1991, and December, 1992. In October, 1992, the Commission filed a request for comments on its *general* ratemaking treatment of the shift to accrual accounting for retiree medical benefits. On the same day that the Commission issued its decision in this case, it promulgated a Policy Statement generally authorizing FERC-regulated companies to submit rates based on the accrual method. Norwood charges that because the Commission was simultaneously considering the same basic accrual accounting issue in this case and in its Policy Statement, improper *ex parte* contacts were brought to bear on the adjudication here.

Specifically, Norwood has identified five documents that reveal contacts between industry groups and FERC on the issue of FERC's approach to accrual accounting. J.A. at 268–91. These contacts all took place before October, 1992, when FERC issued its request for public comments on the matter in its policymaking proceeding, and they express industry support of a general switch to ratemaking based on accrual accounting. None of the communications was made by any party to the NEP proceeding, and none discusses this specific case.

After FERC decided the NEP case, Norwood brought these documents to FERC's attention and moved to reopen the record (1) to include the documents in the record, (2) to determine "the extent to which these *ex parte* communications have compromised" the decisionmaking process, (3) to "determine if any other *ex parte* communications or other irregularities have compromised the fairness and lawfulness of the decisionmaking process," and (4) to "determine the appropriate remedies, including, but not limited to, the right to respond through both written and oral pleadings, directly to the Commission." Motion of the Town of Norwood to Reopen the Record at 1–2, *reprinted in* J.A. at 261–62.

In response, the Commission placed the documents in the record and afforded Norwood the opportunity to submit a written response. Instead of submitting written comments, Norwood filed a request for a rehearing. The Commission denied this request on the grounds that none of the alleged *ex parte* communications involved any parties to the NEP proceeding and that "Norwood ... has presented no evidence that would support an argument that the opinion's findings were based upon anything other than the evidentiary record developed in *this* proceeding." 65 F.E.R.C. ¶ 61,036 at 61,402.

Based on the record before us, we conclude that the Commission's assessment and response was entirely appropriate. The parties contacting the Commission on the ratemaking treatment of accrual accounting had no interest in the merits of this particular case. They were concerned with the industry-wide, policy issue of accrual accounting. *See Louisiana Ass'n of Independent Producers & Royalty Owners v. FERC,* 958 F.2d 1101, 1113 (D.C.Cir.1992) ("Agency officials may meet with members of the industry ... to maintain the agency's knowledge of the industry it regulates.... '[S]uch informal contacts between agencies and the public are the "bread and butter" of the process of administration and are completely appropriate so long as they do not frustrate judicial review or raise serious questions of fairness.'") (quoting *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 47 (D.C.Cir.), *cert denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977)). Norwood has not pointed to anything of substance in the allegedly *ex parte* communications that was improper, prejudicial, or substantively distinct from information available in the record of *this* proceeding. To the contrary, the Commission's deci-

sion in this case is fully supported on its own record and is fully amenable to judicial review on that record. The Commission's response of placing the alleged *ex parte* communications on the record and affording Norwood an opportunity to respond was proper and adequate under the circumstances.

## V. Conclusion

For the foregoing reasons, Norwood's petition for review is

*Denied.*