# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 3, 2020            Decided July 31, 2020

No. 19-1067

SFPP, L.P.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

ASSOCIATION OF OIL PIPE LINES, ET AL.,
INTERVENORS

———

Consolidated with 19-1077, 19-1078, 19-1081, 19-1082,
19-1084, 19-1086, 19-1090

———

On Petitions for Review of Orders of
the Federal Energy Regulatory Commission

———

*Charles F. Caldwell* argued the cause for petitioner SFPP,
L.P. With him on the briefs were *Michelle T. Boudreaux*,
*Sabina D. Walia*, *Daniel W. Sanborn*, and *Susan B. Kittey*.

*Steven M. Kramer* and *Daniel J. Poynor* were on the briefs
for intervenor Association of Oil Pipe Lines in support of

petitioner SFPP, L.P. *Steven H. Brose* and *Steven G. Reed* entered an appearance.

*Gregory S. Wagner* argued the cause for Shipper petitioners. With him on the joint briefs were *Steven A. Adducci*, *Matthew D. Field*, *Richard E. Powers Jr.*, *Melvin Goldstein*, *Thomas J. Eastment*, and *Frederick G. Jauss*, *IV*.

*Scott Ray Ediger*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondents. With him on the brief were *Michael F. Murray*, Deputy Assistant Attorney General, *Robert J. Wiggers* and *Robert B. Nicholson*, Attorneys, U.S. Department of Justice, *James P. Danly*, General Counsel, Federal Energy Regulatory Commission, *Robert H. Solomon*, Solicitor, and *Elizabeth E. Rylander*, Attorney.

*Charles F. Caldwell*, *Sabina D. Walia*, *Daniel J. Poynor*, *Daniel W. Sanborn*, *Susan B. Kittey*, and *Steven M. Kramer* were on the joint brief for intervenors SFPP, L.P. and Association of Oil Pipe Lines in support of respondents.

*Steven A. Adducci*, *Matthew D. Field*, *Gregory S. Wagner*, *Richard E. Powers Jr.*, *Melvin Goldstein*, *Thomas J. Eastment*, and *Frederick G. Jauss*, *IV* were on the joint brief for Shipper intervenors in support of respondents.

Before: SRINIVASAN, *Chief Judge*, ROGERS and WILKINS, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: SFPP, L.P., is a common-carrier oil pipeline that transports petroleum products through Arizona, California, Nevada, New Mexico, Oregon, and Texas. SFPP, along with

several shippers that transport petroleum products over SFPP's pipelines, challenge two Federal Energy Regulatory Commission orders concerning SFPP's tariffs.

SFPP first filed the tariff increases at issue in 2008.  FERC initially addressed those tariffs in a series of three orders. *SFPP, L.P.*, Opinion 511, 134 FERC ¶ 61,121 (Feb. 17, 2011); *SFPP, L.P.*, Opinion 511-A, 137 FERC ¶ 61,220 (Dec. 16, 2011); *SFPP, L.P.*, Opinion 511-B, 150 FERC ¶ 61,096 (Feb. 19, 2015).  We granted petitions for review and vacated those orders in part in *United Airlines, Inc. v. FERC*, 827 F.3d 122, 137 (D.C. Cir. 2016).  FERC issued two further orders on remand.  *SFPP, L.P.*, Opinion 511-C, 162 FERC ¶ 61,228 (Mar. 15, 2018); *SFPP, L.P.*, Opinion 511-D, 166 FERC ¶ 61,142 (Feb. 21, 2019).

SFPP and Shippers petition for review of these two orders on remand from *United Airlines*.  SFPP challenges FERC's decisions to deny SFPP an income tax allowance, to decline to reopen the record on that issue, and to deny SFPP's retroactive adjustment to its index rates.  Shippers challenge FERC's disposition of SFPP's accumulated deferred income taxes ("ADIT") and its temporal allocation of litigation costs.

We deny the petitions for review.  With respect to SFPP's challenges, we hold that FERC's denial of an income tax allowance to SFPP was both consistent with our precedent and well-reasoned and that FERC did not abuse its discretion or act arbitrarily in declining to reopen the record on that issue.  We further hold that FERC reasonably rejected retroactive adjustment to SFPP's index rates.  With respect to Shippers' challenges, we hold that FERC correctly found that the rule against retroactive ratemaking prohibited it from refunding or continuing to exclude from rate base SFPP's ADIT balance, and that FERC reasonably allocated litigation costs.

## I. Income Tax Allowance

The first issue in these petitions for review is whether FERC's denial of an income tax allowance in SFPP's cost of service was lawful. In Opinion 511-C, FERC concluded that granting both an income tax allowance and a discounted cash flow return on equity resulted in double recovery of income tax costs. Opinion 511-C ¶¶ 21–22. To prevent that double recovery, FERC denied SFPP an income tax allowance. *Id.* at ¶ 21. FERC then denied rehearing on the issue. *See* Opinion 511-D ¶ 10.

SFPP contends that FERC's orders are both contrary to our decision in *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945 (D.C. Cir. 2007), and arbitrary and capricious in their treatment of *United Airlines,* 827 F.3d 122, in connection with their conclusion that the discounted cash flow return on equity produces a pre-tax return, and in their purported lack of consideration for the income tax liability of SFPP's corporate parent. We disagree. FERC's denial of an income tax allowance in SFPP's cost of service was fully consistent with our precedent and well-reasoned.

## A. Background

Rates for pipelines subject to FERC's jurisdiction must be "just and reasonable." *BP W. Coast Prods., LLC v. FERC*, 374 F.3d 1263, 1286 (D.C. Cir. 2004). Just and reasonable rates "yield[] sufficient revenue to cover all proper costs, including federal income taxes, plus a specified return on invested capital." *City of Charlottesville v. FERC*, 774 F.2d 1205, 1207 (D.C. Cir. 1985). "There is no question that as a general proposition a pipeline that pays income taxes is entitled to recover the costs of the taxes paid from its ratepayers." *BP W.*

*Coast*, 374 F.3d at 1286. Master limited partnerships ("MLPs") like SFPP was at relevant times, however, incur no income tax liability at the entity level. *Id.* (citing 26 U.S.C. § 7704(d)(1)(E)). In this case, we once again address FERC's income tax allowance policy for such partnership pipelines.

FERC's policy on this issue has a "tortuous history." *ExxonMobil*, 487 F.3d at 948. As we outline below, this Court has vacated two of FERC's previous policies. The third time turns out to be the charm: we now uphold FERC's third policy.

FERC's first policy afforded partnership pipelines an income tax allowance for income taxes that were attributable to corporate but not individual unitholders. *Lakehead Pipe Line Co., L.P.*, 71 FERC ¶ 61,338, at ¶ 62,314–15 (June 15, 1995). Pursuant to its *Lakehead* policy, FERC granted SFPP an income tax allowance for the portion of its income attributed to its corporate unitholders in SFPP's rate filings. *See SFPP, L.P.*, Opinion No. 435, 86 FERC ¶ 61,022, at ¶ 61,102–04 (Jan. 13, 1999), *reh'g denied in relevant part*, Opinion No. 435-A, 91 FERC ¶ 61,135, at ¶ 61,508–09 (May 17, 2000).

This Court vacated those orders in relevant part. *BP W. Coast*, 374 F.3d at 1285. We concluded that the *Lakehead* policy lacked a reasoned basis to afford "corporate tax allowances for corporate unit holders, but [not] individual tax allowances reflecting the liability of individual unit holders." *Id.* at 1290. FERC sought to justify that distinction on the ground that individuals who invest in corporations that in turn invest in pipelines face an additional layer of taxation not faced by investors who invest directly in pipelines. *Id.* at 1288. We rejected that ground as "a product of the corporate form, not of the regulated or unregulated nature of the pipeline or any comparable investment or of the risks involved therein." *Id.* at 1291. We further concluded that, when the regulated entity

generates no tax, "the regulator cannot create a phantom tax in order to create an allowance to pass through to the rate payer." *Id.* We reasoned that investor-level income tax costs are no different than any other investor-level cost, such as bookkeeping expenses, for which investors receive no separate allowance. *Id.* We thus concluded that SFPP was "entitled to no allowance for the phantom income taxes it did not pay." *Id.* at 1288.

In response to *BP West Coast*, FERC adopted its second policy. That policy in a sense leveled up rather than down, affording partnership pipelines an income tax allowance "on all partnership interests . . . if the owner of that interest has an actual or potential income tax liability on the public utility income earned through the interest." *Policy Statement on Income Tax Allowances*, 111 FERC ¶ 61,139, at ¶ 61,736 (May 4, 2005). Pursuant to that policy, FERC granted SFPP an income tax allowance on remand from *BP West Coast* to provide for the taxes paid on partnership income for both its individual and corporate partners. *SFPP, L.P.*, 111 FERC ¶ 61,334, at ¶ 62,455–56 (June 1, 2005) (SFPP 2005 ITA Order).

This Court denied, in relevant part, petitions for review of FERC's order on remand. *ExxonMobil*, 487 F.3d at 955. We concluded that FERC had "resolved the principal defect of the *Lakehead* policy, which was the inadequately explained differential treatment of the tax liability of individual and corporate partners." *Id.* at 951. We also held that FERC had adequately explained why granting an income tax allowance did not create a phantom tax liability. *Id.* at 954–55. In particular, because income taxes on each partner's distributive share of the pipeline's income must be paid regardless of whether the partner actually receives a distribution, we held that FERC reasonably attributed such taxes to the regulated

entity. *Id.* at 952. In closing, we noted that "a fair return on equity might have been afforded if FERC had . . . comput[ed] return on pretax income and provid[ed] no tax allowance at all," but we left that "policy decision" to FERC. *Id.* at 955.

SFPP filed to increase its tariffs again in 2008, and FERC again granted SFPP a full income tax allowance. *See* Opinion 511 ¶ 61,546, *reh'g denied in relevant part*, Opinion 511-A ¶ 62,353.

Shippers petitioned for review of those orders. They contended that granting an income tax allowance in addition to a return on equity calculated via FERC's discounted cash flow methodology results in a double recovery of tax costs. *United Airlines*, 827 F.3d at 134. We granted those petitions in *United Airlines*, concluding that FERC had failed to demonstrate otherwise, rendering its orders arbitrary or capricious. *Id.* We reasoned that FERC's discounted cash flow methodology "determines the pre-tax investor return required to attract investment, irrespective of whether the regulated entity is a partnership or a corporate pipeline." *Id.* at 136. Moreover, unlike corporate pipelines, partnership pipelines incur no income taxes at the entity level. *Id.* Therefore, granting an income tax allowance would account only for taxes already provided for in the discounted cash flow return on equity. *See id*. We then vacated and remanded to FERC to consider "mechanisms for which the Commission can demonstrate that there is no double recovery," such as "remov[ing] any duplicative tax recovery for partnership pipelines directly from the discounted cash flow return on equity," or "eliminating all income tax allowances and setting rates based on pre-tax returns." *Id.* at 137.

In response to *United Airlines*, FERC adopted its third policy. Under that policy, FERC would "no longer permit

MLPs to recover an income tax allowance in their cost of service." *Inquiry Regarding the Commission's Policy for Recovery of Income Tax Costs*, 162 FERC ¶ 61,227, at ¶ 8 (Mar. 15, 2018). The same day it adopted that policy, FERC denied SFPP an income tax allowance on the basis that granting an income tax allowance in addition to a discounted cash flow return on equity would result in double recovery of income tax costs. Opinion 511-C ¶¶ 21–22. FERC denied rehearing on the issue. *See* Opinion 511-D at ¶ 10. SFPP now petitions for review.

## B. Double Recovery

We review FERC orders under the Administrative Procedure Act ("APA"), which empowers the Court to reverse "any agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1102 (D.C. Cir. 2019) (citation and internal quotation marks omitted); *see* 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard, "FERC's decisions will be upheld as long as the Commission has examined the relevant data and articulated a rational connection between the facts found and the choice made." *ExxonMobil*, 487 F.3d at 951. "In reviewing FERC's orders, we are 'particularly deferential to the Commission's expertise' with respect to ratemaking issues." *Id.* (quoting *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1431 (D.C. Cir. 1996)). But the Court gives no deference to an agency's interpretation of judicial precedent. *New York New York, LLC v. NRLB*, 313 F.3d 585, 590 (D.C. Cir. 2002).

FERC's orders adopt and apply a policy that is consistent with this Court's precedents in *BP West Coast*, *ExxonMobil*, and *United Airlines*, and is reasonably explained. Accordingly, we deny the petition for review on the double-recovery issue.

First, FERC's policy is consistent with this Court's precedents. While we upheld an income tax allowance for SFPP in *ExxonMobil*, 487 F.3d at 955, we clarified in *United Airlines* that *ExxonMobil* did not foreclose "the possibility of eliminating all income tax allowances and setting rates based on pre-tax returns," 827 F.3d at 137. Indeed, we noted in *ExxonMobil* that "a fair return on equity might have been afforded if FERC had . . . comput[ed] return on pretax income and provid[ed] no tax allowance at all for the pipeline owners." 487 F.3d at 955. *ExxonMobil* held only that FERC had adequately justified its "policy decision" to provide an income tax allowance in that case. *Id.*

That case, though, implicitly reserved the double-recovery issue because FERC represented that it was addressing it in a separate proceeding. *United Airlines*, 827 F.3d at 135. And in *United Airlines*, we concluded that FERC had failed to engage in reasoned decision-making on the double-recovery issue. *Id.* at 134. We charged FERC on remand with considering "mechanisms for . . . demonstrat[ing] that there is no double recovery," including potentially "eliminating all income tax allowances and setting rates based on pre-tax returns." *Id.* at 137. FERC's orders do exactly that.

Of course, while an "agency is free to adopt a new policy on remand" following vacatur of its prior policy for lack of reasoned decision-making, the agency still must provide a reasoned basis for that new policy. *ExxonMobil*, 487 F.3d at 954. FERC did so here. FERC concluded that granting both an income tax allowance and a discounted cash flow return on equity results in double recovery of tax costs, and, to avoid that problem, denied SFPP an income tax allowance. Opinion 511-C ¶¶ 21–22.

SFPP no longer challenges FERC's solution to the double-recovery problem, but only the problem's existence in the first place. On that score, FERC's double-recovery finding tracked this Court's analysis in *United Airlines*. FERC reasoned from two core premises. First, SFPP does not incur entity-level income taxes. Opinion 511-C ¶ 22. Second, the discounted cash flow methodology determines "a return that covers investor-level taxes and leaves sufficient remaining income to earn investors' required after-tax return." *Id.* From those two premises, it follows that granting SFPP an income tax allowance for its investor-level income taxes and a discounted cash flow return on equity results in a double recovery of income tax costs. *Id.*

SFPP challenges only the second premise, contending that the discounted cash flow methodology does not determine a pre-tax return. SFPP contends that, because investors knew, under FERC's previous policy approved in *ExxonMobil*, that they would recover income tax costs via an income tax allowance, they would not require a return on equity that covers those same income taxes. We cannot conclude that FERC's contrary conclusion was unreasonable.

Under FERC's discounted cash flow methodology, a pipeline's return on equity is based on the yields of a proxy group of publicly traded securities with comparable risks. *United Airlines*, 827 F.3d at 128. FERC calculates those yields as the present value of expected dividends or distributions divided by the stock or unit price. *Id.* Investors must pay income taxes on their distributive share of the pipeline's income, regardless of whether the source of that income is an income tax allowance or any other cost-of-service line item. *See ExxonMobil*, 487 F.3d at 952 (citing *United States v. Basye*, 410 U.S. 441, 453 (1973)). Consequently, an investor's distributive share of the pipeline's income must provide for

both the investor's income tax liability on that income and the investor's after-tax required return, regardless of whether the pipeline is afforded an income tax allowance. *See* Opinion 511-C ¶ 22.

FERC explained this phenomenon as follows:

> If an MLP Pipeline obtains a new revenue source that increases distributions to investors (such as an income tax allowance), the unit price will rise until, once again, the investor receives the cash flow necessary to cover the investor's income tax liabilities and to earn an after-tax return that is comparable to other investments of similar risk. Likewise, if the MLP's cash flows are reduced (such as via the removal of the income tax allowance) and consequently distributions decline, the MLP unit price will drop until the returns once again both cover investors' tax costs and provide sufficient after-tax returns. Whether or not an MLP Pipeline receives an income tax allowance, the MLP's [discounted cash flow] return will always be a pre-investor tax return.

Opinion 511-D ¶ 14 (citations omitted). Thus, FERC explained that granting an income tax allowance for investor-level taxes does not alter the investor's discounted cash flow rate of return. It only inflates the pipeline's cost of service with tax costs already covered by that return.

SFPP provides no coherent basis to question that analysis. SFPP suggests that if an MLP pipeline obtains an income tax allowance, the unit price will rise, which will lower the discounted cash flow rate of return. But SFPP neglects that the

unit price rises because expected distributions rise, thus producing no change in the rate of return, as FERC explained. *Id.*

SFPP alternatively contends that that analysis fails to account for the tax liability of SFPP's corporate parent. That is incorrect. As FERC explained, "investor-level costs . . . are not included in a line item in the cost of service" because they are "adequately addressed by the [discounted cash flow return on equity]." Opinion 511-C ¶ 29 n.67. Investors, including corporations, will not invest "unless the returns are sufficient to (a) cover the investor's costs and (b) allow the investor to retain a sufficient return notwithstanding those costs." *Id.* And as we explained previously, investor-level income tax costs are "no different" than any other investor-level cost, like bookkeeping expenses. *BP W. Coast*, 374 F.3d at 1291.

In sum, consistent with our precedents, FERC reasonably identified a double-recovery problem, and reasonably chose to solve that problem by removing the income tax allowance for partnership pipelines. Accordingly, we deny the petition for review of this issue.

## II. Reopening the Record

The second issue in these petitions for review is whether FERC's denial of SFPP's request to reopen the record was lawful. SFPP contends that FERC abused its discretion and arbitrarily treated SFPP differently from similarly situated pipelines.[*] We hold that FERC neither abused its discretion nor acted arbitrarily.

---

[*] SFPP expressly frames its contentions for the wrongfulness of FERC's refusal to reopen the record as "arbitrary and capricious" arguments. SFPP's Opening Br. 25; *see generally id.* at 25–32. While we have occasionally iterated the standard of review applied to such a refusal

13

FERC "may" reopen the record if FERC "has reason to believe that [doing so] is warranted by any changes in conditions of fact or of law." 18 C.F.R. § 385.716(c). Changes always occur after closing the record, so such discretion "is reserved for extraordinary circumstances." *Cities of Campbell v. FERC*, 770 F.2d 1180, 1191 (D.C. Cir. 1985). FERC need not "hold[] an evidentiary hearing open indefinitely," waiting for a party to "figur[e] out what its story really is." *Id.* at 1191–92. We are similarly reluctant to remand for further proceedings absent a change "that is not merely 'material' but . . . goes to the very heart of the case." *Greater Bos. Television Corp. v. FCC*, 463 F.2d 268, 283 (D.C. Cir. 1971).

After the issuance of Opinion 511-C, SFPP filed a motion to reopen the record, proposing to introduce four new exhibits on double recovery. Opinion 511-D ¶ 19. FERC denied SFPP's motion, concluding that SFPP's proffers provided "no basis to warrant reopening the record at this late stage in the proceeding that outweighs the need for finality in the administrative process." *Id.* at ¶ 27. FERC noted that SFPP had "fully litigated" this issue "through briefing and expert testimony in the Commission proceeding prior to *United Airlines*, briefing before the D.C. Circuit, its comments and supplemental comments following the *United Airlines* remand, and its request for rehearing of Opinion No. 511-C." *Id.* (citations omitted).

---

as "abuse of discretion," *see, e.g.*, *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 115 (D.C. Cir. 2014) (citation omitted), we have also recognized that "arbitrary, capricious, or an abuse of discretion" review under 5 U.S.C. § 706(2)(A) "is now routinely applied by the courts as one standard under the heading of 'arbitrary and capricious review,'" *Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009); *accord* HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW 278 (3d ed. 2018). We disambiguate SFPP's lines of argument for the sake of analytical clarity.

FERC did not abuse its discretion in so concluding. SFPP contends that the market response to Opinion 511-C warranted reopening the record. But a market response, while relevant, is a kind of change that often occurs following issuance of a FERC opinion. And FERC itself concluded that the response here, namely significant drops in MLP prices, "do[es] not undercut the holdings of Opinion No. 511-C." *Id.* at ¶ 34. SFPP further contends that consideration of the income taxes for SFPP's corporate parent warranted reopening the record. But, as FERC explained, any argument for an income tax allowance solely for SFPP's corporate parent was both procedurally untimely because SFPP failed to raise the issue to FERC prior to its request for rehearing, *id.* at ¶ 41, and substantively dubious given this Court's vacatur of the *Lakehead* policy in *BP West Coast*, *see id*. at ¶¶ 41–45.

Nor did FERC treat SFPP differently from similarly situated pipelines. To be sure, in denying rehearing of its revised policy, FERC indicated that parties "will not be precluded in a future proceeding from arguing and providing evidentiary support . . . and demonstrating that [their] recovery of an income tax allowance does not result in a double-recovery of investors' income tax costs." *Inquiry Regarding the Commission's Policy for Recovery of Income Tax Costs*, 164 FERC ¶ 61,030, at ¶ 8 (July 18, 2018). FERC did also order further proceedings in SFPP's rate case after issuance of the 2005 Policy Statement on remand from *BP West Coast*. SFPP 2005 ITA Order ¶¶ 66–77. But here, SFPP had ample chance to present its case on the double-recovery issue both leading up to and on remand from *United Airlines*. Opinion 511-D ¶ 27. It was not arbitrary for FERC to deny SFPP "yet another bite at the apple" while leaving the door open for other pipelines to argue the double-recovery issue on the facts of their cases. *Id*.

### III. Index Rates

The third issue in these petitions for review is whether FERC unlawfully directed SFPP to use its originally filed index rates in its compliance filing. SFPP contends that FERC's decision conflicted with *BP West Coast* and was arbitrary. We disagree on both counts.

In setting prospective rates, "it is ordinarily impossible for a pipeline to know at the time of filing what its actual costs will be during the effective period of the filed rates." *BP W. Coast*, 374 F.3d at 1307. Consequently, SFPP uses a test year to calculate its cost of service. *Id.* SFPP then designs a rate to reflect that cost of service, and multiplies that rate by an index to calculate the rate each year during the effective period for those rates. *See id.* at 1302. In *BP West Coast*, we approved use of the same indexing methodology used to calculate prospective rates to also calculate retrospective reparations in rate cases. *Id.* at 1307.

In its original filing, SFPP proposed index rates for 2012 and 2013 of 5.4% and 7.77%, respectively. Opinion 511-C ¶ 55. But SFPP's compliance filing to Opinion 511-B, which calculated certain refunds, used index rates of 5.52% and 8.5% for those years. *Id.* In Opinion 511-C, FERC ordered SFPP to recalculate its refunds and going-forward rates based on its originally filed index rates. *Id.* at ¶ 57. FERC explained that it would not permit refunds following a rate case that are based on index rates different from those previously filed by the pipeline and accepted by FERC. *Id.*

That decision does not conflict with *BP West Coast*. In *BP West Coast*, we upheld the use of indexes for retrospective reparations calculations, 374 F.3d at 1307, but we had no

occasion to consider the issue here: "the permissibility of retroactive indexing increases that had not previously been sought by the pipeline," Opinion 511-C ¶ 57.

FERC's decision was also well-reasoned. FERC justified its position in Opinion 522-B on SFPP's East Line Rates. *Id.* (citing *SFPP, L.P.*, Opinion 522-B, 162 FERC ¶ 61,229 (Mar. 15, 2018)). In Opinion 522-B, FERC provided five reasons for holding SFPP to its originally filed index rates. Opinion 522-B ¶¶ 16–21.

First, SFPP's cost-of-service litigation "neither altered the industry-wide annual inflationary changes justifying the . . . annual index changes nor addressed the annual cost changes SFPP itself experienced." *Id.* at ¶ 16. And the fact that FERC reduced SFPP's rates in its rate case "does not justify allowing SFPP now to revisit its . . . indexing filings that involve unrelated cost changes." *Id.* Second, allowing SFPP's retroactive adjustment would inoculate SFPP from the risk of its chosen ratemaking strategy. *Id.* at ¶ 17. Third, it would "undermine the simplified and streamlined procedures indexing was intended to achieve." *Id.* at ¶ 18. Shippers would need to litigate index increases when SFPP initially proposed them and again when SFPP newly proposed them at the compliance stage, and potentially again should SFPP propose still different index increases following further compliance filings. *Id.* Fourth, SFPP's adjustment would disregard regulations providing for 30-days' notice of rate changes. *Id.* at ¶ 19. Fifth and finally, SFPP's retroactive changes would "undermine predictability and rate certainty for shippers." *Id.* at ¶ 20. While shippers had the opportunity to consider SFPP's rates and any aspects subject to ongoing litigation when deciding to use SFPP's services, shippers had "no notice of the . . . index increases SFPP now seeks to retroactively impose" on shippers' "prior movements." *Id.*

SFPP provides no substantial basis to question that well-reasoned decision. We accordingly deny the petition for review as to this issue.

## IV. Shippers' Petition

For their part, Shippers petition for review of FERC's orders on two bases: first, FERC's treatment of the ADIT balance that accumulated between 1992 and 2008; and second, FERC's decision that SFPP could recover its litigation expenses over a three-year period. We find that FERC's decisions on these points were reasonable, reasonably explained, and not otherwise arbitrary or capricious. We therefore deny Shippers' petition for review.

Again, FERC orders are reviewed under the APA's arbitrary and capricious standard. *Hoopa Valley Tribe*, 913 F.3d at 1102; 5 U.S.C. § 706(2)(A). So long as the Commission "has examined the relevant data and articulated a rational connection between the facts found and the choice made," we will uphold its decisions. *ExxonMobil*, 487 F.3d at 951. And we are "'particularly deferential to the Commission's expertise' with respect to ratemaking issues." *Id.* (quoting *Ass'n of Oil Pipe Lines*, 83 F.3d at 1431).

## A. Background

A "depreciation deduction" is a tax deduction whereby "a property owner can deduct the cost of its property over the property's useful life." *Telecom\*USA, Inc. v. United States*, 192 F.3d 1068, 1069 (D.C. Cir. 1999). The most basic method of depreciation is "straight-line" depreciation, which allows a property owner to spread the depreciation of an asset evenly across the years of its useful life. *See id.* at 1069–70 ("[F]or

example, an asset with an initial cost of $1,000,000, a salvage value of $50,000, and a useful life of 10 years would generate annual deductions of $95,000."). Pertinent here, the IRS also allows for "accelerated" depreciation, whereby a "company pays less tax than it would under straight-line depreciation in the early years of the life of the equipment, and more tax than it would under straight-line depreciation in the later years of the life of the equipment." *Town of Norwood v. FERC*, 53 F.3d 377, 382 (D.C. Cir. 1995) (emphases omitted); *accord, e.g.*, Opinion 435 ¶ 61,092 (Jan. 13, 1999). In other words, under the IRS's accelerated-depreciation scheme, a company may frontload its tax write-offs for the depreciation of an asset.

FERC's ratemaking principles employ straight-line depreciation. *See* Opinion 511-D ¶ 62. But FERC permits a utility to shield its ratepayers from sudden rate increases resulting from accelerated depreciation by using an accounting method called "tax normalization." *Town of Norwood*, 53 F.3d at 382. Under tax normalization, the utility creates a deferred tax account, called an ADIT account:

> The company charges the ratepayers the tax that they would be responsible for under straight-line depreciation throughout the life of the equipment. Thus, in the early years, the company collects more in rates than it pays in taxes to the IRS; in the later years, it collects less in rates than it pays in taxes. The company holds onto the surplus from the early years in a deferred tax account, and uses this surplus to make up for the deficit in the later years.

*Id.* (emphases omitted); *see also* Opinion 511-D ¶ 91 ("The purpose of normalization is matching the pipeline's cost-of-

service expenses in rates with the tax effects of those same cost-of-service expenses.").  Additionally, a pipeline

> must reflect ADIT balances in its rate base. This ensures that regulated entities do not earn a return on cost-free capital based upon the timing differences between (a) when pipelines recover the normalized tax costs in rates using straight-line depreciation; and (b) when taxes are actually paid to the IRS using accelerated depreciation.  These timing differences create "cost-free" capital because the pipeline may use these funds without paying either a return to equity investors or interest on debt.  In a cost-of-service proceeding, the Commission requires the pipeline to deduct the sums in the ADIT liability accounts from rate base so the pipeline does not improperly earn a return on amounts funded by cost-free capital.  Reflecting ADIT in rate base generally lowers rates because the pipeline does not earn a return on the deferred taxes.

Opinion 511-D ¶ 63.  FERC's calculations to determine a cost-based rate base use the trended original cost ("TOC") method, which "requires the determination of a nominal (inflation-included) rate of return on equity that reflects the pipeline's risks and its corresponding cost of capital." *Williams Pipe Line Co.*, 31 FERC ¶ 61,377, at ¶ 61,834 (June 28, 1985).

In Opinion 511-C, having found that SFPP was not entitled to include an income tax allowance in its rates, *see* Opinion 522-B ¶¶ 15–22, FERC directed SFPP to make a compliance filing recalculating its rates and the refunds due to shippers. Opinion 511-C ¶¶ 57–58.  SFPP then made a compliance filing,

J.A. 934–68, wherein it removed the ADIT balance from its cost of service ("i.e., eliminate[d] the deduction from rate base of ADIT liability accounts," Opinion 511-D ¶ 64, and "eliminated the recognition of ADIT balances of approximately $28,021,359," *id.* at ¶ 89). SFPP's compliance filing also included, in the rates effective from August 2008 through July 2011, a litigation surcharge, whereby it proposed to recover in its rates the $8 million-plus it incurred over the course of its litigation of this case, *id.* at ¶¶ 109, 111, 118; *see* Opinion 511 ¶ 37 (adopting three-year surcharge); Opinion 511-A ¶ 42 (on rehearing, affirming adoption of three-year surcharge).

Shippers filed comments opposing both of these aspects of SFPP's compliance filing. *See, e.g.*, J.A. 971; *see generally id.* at 969–95. In particular, Shippers argued "that as a result of the elimination of SFPP's income tax allowance, the entire ADIT balance [wa]s overfunded and should be amortized to shippers," Opinion 511-D ¶ 65; *see also id.* at ¶¶ 66–67, and that "the litigation expenses should be recovered over the entire litigation and refund period, rather than an arbitrary three-year period," because the litigation lowered rates during the entire period, benefitting all the shippers, *id.* at ¶ 111. FERC rejected Shippers' arguments on these scores in Opinion 511-D. *Id.* at ¶¶ 61–108 (ADIT); *id.* at ¶ 118 (litigation surcharge).

## B. ADIT

FERC's explanation for its decision to permit SFPP to eliminate the ADIT balance, and not to require amortization of the sum that was previously ADIT back to Shippers through prospective rates, rested on three pillars. First, FERC reasoned that the elimination of the ADIT balance was appropriate in light of the removal from SFPP's cost of service of an income tax allowance. Opinion 511-D ¶¶ 90–91 ("As SFPP is not

permitted to recover an income tax allowance in its rates, there is no rationale for requiring SFPP to record current or deferred income taxes on its books."). FERC further explained that "ratepayers have no equitable interest or ownership claim in ADIT." *Id.* at ¶ 92; *see also id.* at ¶ 94 ("Rates designed pursuant to the normalization principles . . . do not 'over-collect' the pipeline's tax expenses in the early years. Rather, such rates require shippers receiving service in the early years to pay their properly allocated share of the pipeline's tax expenses for the period of their service.") (citation omitted). Finally, FERC explained that requiring SFPP to return ADIT to ratepayers would violate the rule against retroactive ratemaking. *Id.* at ¶¶ 93–98, 100–03, 105.

Shippers contend that FERC committed an unexplained departure from its precedent and policies in permitting SFPP to eliminate the ADIT balance rather than amortizing it. Shippers also dispute FERC's characterization of their proposed solution of amortization as retroactive ratemaking, and further assert that, in allowing SFPP to simply eliminate the ADIT balance, FERC has in fact engaged in retroactive ratemaking.

We are not persuaded. We agree with FERC that refunding ADIT to ratepayers or continuing to remove it from rate base would constitute impermissible retroactive ratemaking, and accordingly we have no need to address Shippers' other contentions. Shippers' twin arguments on the retroactive-ratemaking issue—that amortizing the ADIT sum back to ratepayers would not have been retroactive ratemaking, and that failing to do so was—are non-starters, as FERC correctly concluded that refunding ADIT, or continuing to remove it from rate base, would violate the rule against retroactive ratemaking.

"[T]he rule against retroactive ratemaking 'prohibits the Commission from adjusting current rates to make up for a utility's over- or under-collection in prior periods.'" *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1227 (D.C. Cir. 2018) (quoting *Towns of Concord, Norwood, & Wellesley v. FERC*, 955 F.2d 67, 71 n.2 (D.C. Cir. 1992)). The question of whether a particular method of ratemaking is retroactive, and thus impermissible, is a question of law rooted in the Interstate Commerce Act ("ICA"), 49 U.S.C. app. § 1 *et seq.* (1988), the statute that governs FERC's regulation of oil pipelines. *Frontier Pipeline Co. v. FERC*, 452 F.3d 774, 776 (D.C. Cir. 2006). The rule against retroactive ratemaking is a "corollary" of the filed rate doctrine, *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007), under which "a regulated entity may not charge, or be forced by the Commission to charge, a rate different from the one on file with the Commission for a particular good or service." *Assoc. Gas Distribs. v. FERC*, 898 F.2d 809, 810 (D.C. Cir. 1990) (mem.) (per curiam) (Williams, J., concurring). The filed rate doctrine is rooted in Section 6(7) of the ICA, 49 U.S.C. app. § 6(7) (1988). *Frontier Pipeline Co.*, 452 F.3d at 776 ("[Section] 6(7) . . . . establishes the familiar filed rate doctrine."); *see Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) ("The filed rate doctrine has its origins in [the Supreme] Court's cases interpreting the Interstate Commerce Act."). "The retroactive ratemaking doctrine is . . . a logical outgrowth of the filed rate doctrine, prohibiting the Commission from doing indirectly what it cannot do directly." *Assoc. Gas Distribs.*, 898 F.2d at 810 (Williams, J. concurring).

We review *de novo* the question of whether amortizing the ADIT balance would have constituted retroactive ratemaking. Opinion 511-D's disposition of this issue "purport[s] to rest on [FERC's] interpretation of [D.C. Circuit] opinions. As such,

[FERC's] judgment is not entitled to judicial deference." *New York New York, LLC*, 313 F.3d at 590.

FERC explained in Opinion 511-D its view that the retroactive ratemaking doctrine prohibits the amortization of the sum that was once ADIT back to shippers in prospective rates:

> Under the Interstate Commerce Act (ICA), the Commission only has the authority to address over-recovery by prospectively changing a pipeline's rate, and may not retroactively refund over-collected amounts. Requiring SFPP, whose tax allowance is eliminated, to amortize to ratepayers ADIT that was lawfully collected under previously filed and approved rates would infringe on the rule against retroactive ratemaking. To do so would, effectively, retroactively apply the holding in Opinion No. 511-C by requiring SFPP to refund either the income tax allowance expenses or deferred tax reserves recovered under past rates for service prior to the commencement of this proceeding. Any attempt to refund such amounts to shippers would be impermissible, as it would rest on a post hoc finding that SFPP's past rates were not just and reasonable.

Opinion 511-D ¶ 93 (citing *City of Piqua v. FERC*, 610 F.2d 950, 954 (D.C. Cir. 1979); *OXY USA, Inc. v. FERC*, 64 F.3d 679, 698–700 (D.C. Cir. 2006); *Public Utilities Comm'n*, 894 F.2d 1372, 1382–84 (D.C. Cir. 1990); *Assoc. Gas Distribs.*, 898 F.2d at 810 (Williams, J., concurring)). FERC also distinguished between the instant situation, where a pipeline's income tax allowance has been completely eliminated, and

circumstances in which ADIT becomes overfunded but an income tax allowance remains:

> Where an income tax allowance remains in the cost of service and there is excess ADIT resulting from a reduction in tax rates, it is appropriate to credit the cost of service to reflect that the pipeline currently needs to collect a lower level of tax expenses in rates to cover the tax liability for that year. Rather than returning the excess amounts to shippers related to past service, the pipeline's cost of service is adjusted on a going forward basis to reflect the fact that it now needs to collect less than what it anticipated to cover its future tax liabilities. In contrast, where there is no income tax allowance in Commission rates, there is no basis for the "matching" function of normalization and no liability for the deferred taxes reflected in ADIT.

*Id.* at ¶ 97 (citations omitted). In FERC's view, "SFPP's ADIT balance prior to the commencement of this proceeding was lawfully collected for the tax costs associated with prior-period service," and "[t]he shippers' proposal to amortize the previously-accumulated ADIT balance in SFPP's prospective rates rests on an impermissible finding that SFPP's past rates were 'in retrospect too high' or 'unjust and unreasonable.'" *Id.* at ¶ 103 (quoting *Public Utilities Comm'n*, 894 F.2d at 1382)).

We concur with FERC's analysis, and, like FERC, we consider *Public Utilities Commission* instructive, as it addressed this precise issue in detail. In that case, a natural-gas company had $100 million in ADIT when it switched from cost-of-service pricing to pricing based on statutory ceilings.

894 F.2d at 1379. Consequently, as here, "the 'turnaround' anticipated under tax normalization," whereby ADIT would be drawn down to cover future tax liability, would "never come to pass." *Id.* at 1375. The Commission allowed the company to retain the ADIT balance, but continued to remove it from the rate base. *Id.* at 1379. This Court held that approach barred by the rule against retroactivity, as it "effectively force[s the company] to return a portion of rates approved by FERC." *Id.* at 1384. We opined that the rule against retroactive ratemaking "seeks to protect" "predictability," *id.* at 1383, and that ratemaking decisions "violate[] the rule against retroactive ratemaking" if they "rest[] on a Commission view that the [prior] rates . . . were in retrospect too high," *id.* at 1380. Here, too, any decision by FERC to return ADIT to Shippers would have as a necessary predicate a conclusion that ADIT should not have been collected in the first place. The rule against retroactive ratemaking therefore prohibits this course of action.

Shippers contend that *Public Utilities Commission* should not control because there the ADIT became overfunded when FERC lost jurisdiction of the ADIT-generating assets, whereas here FERC had disallowed an income tax allowance. We fail to see why the reason ADIT became overfunded is relevant to retroactivity concerns or demands a different result. Shippers also argue that *Public Utilities Commission* was dictum on the retroactive-ratemaking issue, such that FERC erred by relying on it. As noted, we owe no deference to an agency's interpretation of our precedent, *New York New York, LLC*, 313 F.3d at 590, but neither do we perceive any need to parse *Public Utilities Commission* to determine whether its discussion of retroactive ratemaking was dictum or holding, because our review of the legal question presented leads us to concur with FERC's resolution of the issue.

Because FERC could neither refund the ADIT nor continue to remove it from rate base without violating the rule against retroactivity, we cannot say that FERC acted contrary to law or arbitrarily and capriciously in permitting SFPP to remove ADIT from its cost of service. We therefore deny Shippers' petition as to the issue of FERC's treatment of ADIT in Opinion 511-D.

## C. Litigation Expenses

In Opinion 511, FERC held that SFPP could "recover its regulatory litigation expenses attributable to this proceeding through a three-year surcharge" and allowed SFPP "to develop the surcharge to reflect the costs incurring in this proceeding . . . during the hearing, rehearing and compliance phases." Opinion 511 ¶ 35; *accord* Opinion 511-A ¶ 42 (affirming adoption of a three-year period, rather than a five-year period, "because the costs have been incurred over approximately three years of litigation"). SFPP's 511-C compliance filing reflected an updated calculation of that approved surcharge "to account for additional litigation costs incurred since the Opinion 511-B Compliance Filing." Opinion 511-D ¶ 109. Shippers protested to FERC, and now contend to us, that the surcharge (totaling some $8,587,491) should not be "levied over a three-year period," but should instead "be recovered over the entire litigation and refund period," because "the litigation has extended well beyond three years" and, "although all shippers will benefit from the lower rates, only the August 2008 through July 2011 shippers will pay the expenses SFPP has incurred in litigating this case." *Id.* at ¶ 111; *accord* J.A. 991–93 (Shippers' protest); *see also* Shippers' Opening Br. at 34–36 (arguing that FERC offered no "reasoned basis" for its decision); Shippers' Reply Br. at 18–20 (same).

In Opinion 511-D, FERC rejected Shippers' proposal:

> The three-year period for recovering the litigation expenses was approved in Opinion No. 511 and affirmed in Opinion No. 511-A. The shippers provide no support for their proposal to recover the expenses over the entire litigation and refund period, whereas using a shorter period is consistent with both Commission and court precedent. The use of a three-year surcharge remains appropriate because, although the litigation remains ongoing, the majority of the litigation expenses (85.9 percent) were incurred in the earlier stages prior to August 2011. Thus, the three-year recovery period from August 1, 2008 through July 31, 2011 reflects the costliest phase of the litigation.

Opinion 511-D ¶ 118; *see also id.* at n.249 (citing Opinion 435-A ¶ 61,512 (approving five-year surcharge to recover litigation expenses incurred over a longer period)).

Contrary to Shippers' contentions, we find that FERC adequately explained its decision to apply the litigation surcharge over the three-year period spanning August 2008 and July 2011, rather than spreading those costs over the eleven-plus years of the litigation. Even absent FERC's reference to precedent, this decision is reasonable, as FERC's explanation—that 85.9 percent of the expenses were incurred over the three-year period to which the surcharge would apply—supplies sufficient support for FERC's election of the three-year surcharge rather than Shippers' preferred route of an eleven-year surcharge.

## V. Conclusion

For the foregoing reasons, SFPP's and the Shippers' petitions for review are denied.

*So ordered.*